[No. S017657. Aug. 26, 2002.]

In re JESSE JAMES ANDREWS on Habeas Corpus.

## Counsel

Fern M. Laethem and Lynne S. Coffin, State Public Defenders, Billie Jan Goldstein, Therene Powell and Donald J. Ayoob, Assistant State Public Defenders; and Michael N. Burt for Petitioner Jesse Andrews.

John K. Van de Kamp, Daniel E. Lungren and Bill Lockyer, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Assistant

Attorneys General, Marc E. Turchin, Susan Lee Frierson, William T. Harter, Kerrigan M. Keach and Suzann E. Papagoda, Deputy Attorneys General, for Respondent State of California.

## OPINION

## BROWN, J.—

### I. INTRODUCTION

Petitioner Jesse James Andrews was convicted of capital murder. (See *People v. Andrews* (1989) 49 Cal.3d 200 [260 Cal.Rptr. 583, 776 P.2d 285] (*Andrews I*).) As recounted in *Andrews I*, the evidence at trial established the following: "On the evening of December 9, 1979, police were summoned to the Los Angeles apartment of Preston Wheeler. There they found the bodies of Wheeler, Patrice Brandon and Ronald Chism. Wheeler had been stabbed in the chest six times and shot in the neck at close range with either a .32- or .357-caliber weapon. His face and head were bruised, and his face had been slashed with a knife. Brandon and Chism had been strangled with wire coat hangers. Their faces were bruised, Chism's extensively. Brandon's anus was extremely dilated, bruised, reddened and torn, consistent with the insertion of a penis shortly before her death. There was also redness around the opening of her vagina, and vaginal samples revealed the presence of semen and spermatozoa. All three victims were bound hand and foot." (*Id.* at p. 206.)

At trial, the prosecution's chief witness was Charles Sanders, who testified pursuant to a plea bargain in which he pled guilty to three counts of second degree murder in exchange for a promised sentence of 17 years to life in prison.

Sanders testified that he and petitioner devised a plan to rob Wheeler, a drug dealer. Defendant armed himself with a .357 magnum and gave Sanders a .38- or .32-caliber automatic. On the evening of the murders, they visited their friend, Carol Brooks, who lived in the same apartment building as Wheeler, and then went to Wheeler's apartment. "In response to their knocking, Wheeler, who apparently knew [petitioner], let them in. Also inside the apartment was a woman (Patrice Brandon). [¶] After smoking some marijuana with Wheeler, [petitioner] and Sanders drew their guns. Sanders tied Wheeler and Brandon with belts and socks, put on a pair of gloves, and began to search the apartment for drugs and money. Except for some powder on a saucer which appeared to be cocaine, the search was

unsuccessful. [Petitioner] questioned Wheeler, who denied having any drugs or money. Saying he would make Brandon talk, [petitioner] dragged her into the kitchen and closed the door. Sanders remained in the living room with Wheeler." (*Andrews I, supra,* 49 Cal.3d at p. 207.)

Sanders heard petitioner hitting Brandon and later heard sounds as though they were having sex. When petitioner came out of the kitchen shortly thereafter, Sanders saw Brandon's pants around her ankles. (*Andrews I, supra,* 49 Cal.3d at p. 207.)

"[Petitioner] put his gun in Wheeler's mouth. He threatened to kill Wheeler and Brandon unless Wheeler revealed the location of the drugs. Wheeler said the 'dope' was in the attic, and pointed out a trap door leading up to it. Sanders climbed into the attic. [¶] While in the attic, Sanders heard two shots. When he came down, [petitioner] told him he had shot Wheeler because the latter had tried to jump out the window. Sanders asked if Wheeler was dead. [Petitioner] responded he was 'standing right up' on Wheeler when he fired the gun. . . . When Sanders asked about Brandon, [petitioner] replied he had killed her before leaving the kitchen." (*Andrews I, supra,* 49 Cal.3d at p. 207.)

While petitioner and Sanders were cleaning up the apartment, Ronald Chism knocked on the door and asked if everything was all right. Petitioner said Wheeler was home and invited him inside. Petitioner "then hit Chism on the head, tied him up, and took him into the bathroom. Sanders saw [petitioner] sitting astride Chism's back, joining and separating his clenched fists in a tugging motion, apparently strangling Chism." (*Andrews I, supra,* 49 Cal.3d at p. 208.) Sanders then saw petitioner go into the kitchen and choke Brandon with a wire clothes hanger. When the two left the apartment, petitioner gave Sanders some money, saying it was all he had found. (*Ibid.*)

Carol Brooks, whose brother was married to Sanders's sister, testified that on the night of the murders petitioner told her they were going to Wheeler's to get some money. Sanders later acknowledged to her his involvement in the crimes; and petitioner told her he had shot Wheeler, taken $300, and had sex with Brandon. (*Andrews I, supra,* 49 Cal.3d at p. 208.)

Print evidence disclosed the presence of petitioner's fingerprints on Wheeler's living room coffee table. A set of left and right palm prints was found on the kitchen floor, the left one about an inch from Brandon's body. (*Andrews I, supra,* 49 Cal.3d at p. 208.)

Petitioner did not testify. In an effort to undermine Sanders's credibility, the defense called two jail inmates whose testimony implied he had lied

about petitioner's involvement in the crimes to minimize his own. (See *Andrews I, supra,* 49 Cal.3d at p. 209.)

A jury convicted petitioner of the first degree murders of Wheeler, Brandon, and Chism. (Pen. Code, § 187; all undesignated statutory references are to the Penal Code.) As to each murder, it found true special circumstance allegations of prior murder (§ 190.2, subd. (a)(2)), multiple murder (*id.,* subd. (a)(3)), and robbery murder (*id.,* former subd. (a)(17)(i), now subd. (a)(17)(A)). As to Brandon's murder, it found true the rape-murder special-circumstance allegation. (*Id.,* former subd. (a)(17)(iii), now subd. (a)(17)(C).) The jury also convicted petitioner of rape (former § 261, subds. 2, 3), sodomy by a foreign object (§ 289), and robbery (§ 211). It further found petitioner used a firearm in committing each offense. (§ 12022.5.)

Following the penalty phase evidence, the jury determined the punishment should be death. (*Andrews I, supra,* 49 Cal.3d at p. 206.) On automatic appeal, this court affirmed the judgment.

Thereafter, petitioner sought a writ of habeas corpus, alleging his trial attorneys (lead counsel Gerald Lenoir, assisted by Halvor Miller) rendered ineffective assistance at the penalty phase. We issued an order to show cause and subsequently appointed the Honorable Jacqueline A. Connor to conduct a reference hearing and take evidence and make findings of fact on the following six questions:

1. What mitigating character and background evidence could have been, but was not, presented by petitioner's trial attorneys at his penalty trial?

2. What investigative steps by trial counsel, if any, would have led to each such item of information?

3. What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?

4. What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?

5. What evidence, damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, *if* petitioner had introduced any such mitigating character and background evidence?

6. Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? If so, what specifically did petitioner request?

Having considered the record of the hearing, the referee's factual findings, and petitioner's original trial, we conclude petitioner received constitutionally adequate representation, and any inadequacy did not result in prejudice.

## II. PENALTY PHASE EVIDENCE

"At the penalty phase, the prosecution evidence consisted of a stipulation and two exhibits. The parties stipulated that [petitioner] was born on July 2, 1950, and that he pled guilty in Alabama to the crimes of armed robbery in 1968, escape in 1969, and robbery in 1977. The two exhibits were photographs of two of the victims; they had been excluded from the guilt phase on the ground that they were unduly inflammatory.

"The defense penalty phase evidence, admitted under stipulation, consisted of sworn statements describing the circumstances surrounding [petitioner's] prior Alabama murder conviction. According to the statements, [petitioner] and a 17-year-old companion, each of whom carried a gun, entered a grocery store and announced a robbery. When the store clerk placed his hand down the front of his apron, [petitioner's] companion fired three gunshots, killing him." (*Andrews I, supra,* 49 Cal.3d at p. 225.)

In his closing argument, Lenoir presented petitioner as an unsophisticated criminal whose crimes—committed many years apart—escalated when planned robberies took unexpected turns. He noted that the Alabama murder occurred when petitioner was only 16 years old and his confederate, Freddie Square, shot the victim when he apparently reached for a weapon. Lenoir also portrayed his conduct as less blameworthy than that of other special circumstance murderers who had been sentenced to life without possibility of parole. In a similar vein, he emphasized that the current murders occurred when petitioner, Sanders, and victims Brandon and Wheeler were all under the influence of narcotics, characterizing this drug usage as partially blurring the lines between guilty offender and innocent victim, unlike the facts in many capital cases. Counsel further noted Sanders received a sentence of 17 years to life imprisonment.

## III. REFEREE'S REPORT AND PETITIONER'S EXCEPTIONS

### A. *Findings*

The referee provided one-paragraph summaries in response to each question posed in our reference order and also set forth detailed findings on each question.

*1. What mitigating character and background evidence could have been, but was not, presented by petitioner's trial attorneys at his penalty trial?*

"Trial counsel could have presented evidence of petitioner's upbringing and childhood, including evidence of his abandonment by his parents from the age of two. The subsequent loss of his grandfather at the age of 11[1] triggered an absence of structure in his life resulting in truancy, delinquency and eventual incarceration at a young age in a segregated brutal institution near Montgomery, Alabama. Further evidence could have been presented on the impact of the Alabama state prison system on petitioner, following a conviction for robbery-murder at the age of 16. This prison experience did not provide petitioner with a basis for rehabilitation but the evidence did show that petitioner adjusted well when the prison structure permitted it. Additionally, witnesses could have been presented to develop mitigation regarding petitioner's mental health, including a diagnosis of a learning disorder, brain impairment and posttraumatic stress disorder. Finally, petitioner had a large extended family who would have testified to their love and support for petitioner and the impact of his execution on them."

Based on the testimony of more than 50 witnesses,[2] the referee explained in her findings that petitioner's trial attorneys could have presented evidence that petitioner spent his early years in a poor, segregated neighborhood of Mobile, Alabama. His parents were alcoholics who separated soon after his birth. His mother moved to Detroit, Michigan, to better herself when petitioner was two, and his father also moved away when petitioner was young, leaving him in the care of his grandparents and aunt, who raised him in a large family home with his siblings and cousins. Petitioner and his brother were sometimes disciplined by being forced to wear dresses. There was no evidence of abuse; and petitioner apparently had a good relationship with his grandfather, who was described as loving, benevolent, and responsible.[3]

When petitioner was 9 or 10, his mother returned to the family home with two children by another marriage. About the same time, petitioner's grandfather, described by the referee as a "pivotal figure" in his life, died.

---

[1]In his exceptions to the referee's report, petitioner points out that he was 10 years old, not 11, when his grandfather died. The Attorney General agrees.

[2]In this regard, the referee observed, "The length of time available to develop, expand and refine the depth of the evidence presented at this reference hearing obviously creates an artificial setting and this court notes that the abundance and massiveness of the evidence presented could not and would not have been the same in an original trial. Strategic considerations alone would have undoubtedly resulted in a greater refinement of the quality of evidence presented, but this issue is outside the scope of the referee's findings."

[3]There was testimony that petitioner's grandfather had a drinking problem and that petitioner and his siblings were beaten, but the referee described the evidence on these points as "inconsistent."

Petitioner, who grieved for his grandfather, felt rejected by his mother and jealous of her new children. He became withdrawn and began skipping school. At the age of 14, he was committed to the Alabama Industrial School for Negro Children, a reform school known as Mt. Meigs, for car theft.

At Mt. Meigs, petitioner encountered appalling conditions. The referee found "he was subjected to beatings, brutality, inadequate conditions and sexual predators. He also participated with the other boys in using inhalants while at the institution. He was rarely visited by family. His passiveness and small physique caused him to be a target of older, tougher boys, from whom no protection or separation was provided." The evidence also established Mt. Meigs failed to provide any meaningful rehabilitative or educational opportunities.

After petitioner's release at the age of 16, he became withdrawn and uncommunicative. Over his family's objections, he began to associate with older, streetwise boys, including Freddie Square, "a more sophisticated young man with manipulative and criminal tendencies." Within three months, at Square's instigation, petitioner and Square robbed a grocery store. When they drew guns and announced the robbery, the store clerk placed his hand down the front of his apron. Square fired, killing the clerk. Petitioner had acted as a lookout in the robbery, but played a more active role when he and Square robbed a taxi driver during their getaway, firing three shots at the driver as the latter fled the scene. He was convicted of murder and robbery and introduced to the Alabama State Prison system just before turning 18.[4]

Petitioner spent the next 10 years in Mobile County Jail and in Kilby, Draper, Atmore, and Holman Prisons in Alabama. Regarding conditions there, the referee heard the accounts of numerous inmates incarcerated with or during the same time as petitioner as well as testimony of noninmates, several of whom had witnessed the conditions firsthand. On this basis, she described conditions in these institutions as "abysmal," characterized by "severe overcrowding, racial segregation, substandard facilities, no separation of the tougher inmates from younger or smaller inmates, constant violence, the persistent threat of sexual assaults and the constant presence of sexual pressure, the availability and necessity of weapons by all inmates, and degrading conditions in disciplinary modules." Petitioner not only received

---

[4]Petitioner was convicted of murder based on his participation in the robbery of the grocery clerk in November 1967. Six months later, he was convicted of armed robbery of the taxi driver. The jurors at petitioner's penalty trial were told only of the conviction dates, not the date when the crimes were committed, which may have led them to believe the crimes were unrelated.

beatings but "was also personally subjected to sexual assaults." At the same time, the referee noted that petitioner was "personal[ly] involve[d] in violence includ[ing] the stabbings of two inmates who had been threatening him."

In 1976, petitioner was released from prison. He was soon arrested for attempted robbery of a laundry, which "involved taking a young woman hostage at gunpoint and threatening responding police officers." Petitioner escaped from the Mobile County Jail[5] and fled to California, where he found a job and for a short time had a stable relationship with Debra Pickett, with whom he had a child. He then resumed using cocaine and left Pickett. Soon after, he committed the murders in this case. At the reference hearing, petitioner's son, Dominick, who communicates with petitioner through letters and telephone calls, testified that he loved his father and would be devastated if he were executed.

"Extensive psychiatric testimony was presented in the form of several expert witnesses [including Drs. George Woods, Craig Haney, James Park, Dorcas Bowles, John Irwin, and Myla Young]. They generally described the petitioner as suffering from a learning disorder known as attention deficit disorder, and post traumatic stress disorder. They also described mild to moderate organic brain impairment from a history of drug use and abuse, starting with the inhalants at Mt. Meigs, as well as possibly from a head injury suffered while in prison. These witnesses presented evidence that the aggravating circumstances of the murders and sexual assaults were diminished by an awareness of the context of petitioner's participation in the instant crime, that his learning disability and the adverse circumstances of his childhood as well as the impact of the Alabama juvenile and adult correctional systems made his behavior understandable and his reincarceration predictable. The added effect of post traumatic stress disorder was presented to mitigate his actions in the Warhurst and laundromat robberies as well as the instant charges. The additional impacts of his experiences in the prison system provide an argument that he was prevented from adjusting to the free world and that his alienation from conventional society led him back to the familiar world of crime."

Sifting through the "overwhelm[ing]" "minutiae" of this expert testimony, the referee found that "the impact of petitioner's incarceration history, while a double-edged sword, was compelling, having occurred from an extremely vulnerable and sensitive age. Although there were a number of inconsistencies concerning exactly what petitioner personally experienced, it was undisputed that he was rarely the instigator of violence. On the contrary, the

---

[5]Petitioner had previously attempted but failed to escape from the same jail.

evidence showed that he avoided violence and appeared to adjust well when the structure permitted and that he would continue to do so. His smaller stature made him the target of more violent inmates in virtually every institution in which he was housed. However, when circumstances permitted, he tended to hold positions of responsibility. To the extent that he was involved in prison violence personally, the evidence remains consistent that he was the prey rather than the predator."

 *2. What investigative steps by trial counsel, if any, would have led to each item of evidence?*

"Trial counsel could have contacted petitioner's family to develop his background and childhood, including contacting his mother and other relatives either living in the same location or accessible through known family members. Evidence relating to the impact of the juvenile and adult correctional systems could have been developed by obtaining prison records and contacting inmates referenced in those records as well as conducting standard legal research of public records relating to lawsuits involving these institutions. Mental health experts could have been appointed to review the background material and to test petitioner in order to ascertain the viability of psychiatric mitigation."

In her findings of fact, the referee explained that appellate counsel utilized "standard investigative techniques" to obtain the evidence presented at the reference hearing. She categorized the evidence into three general and partially overlapping areas—the circumstances of petitioner's upbringing, the impact of the correctional facilities in Alabama and petitioner's adult experiences, and the psychiatric aspects of petitioner's history—none of which "called for any extraordinary efforts beyond simple persistence."

In the referee's view, petitioner's attorneys could readily have learned about petitioner's upbringing from their contact with his mother. Other family members and acquaintances could have been found through her; and many were willing to testify on petitioner's behalf. Addresses and information were also independently available from public documents; and counsel could have reached numerous individuals familiar with petitioner's family and upbringing with little effort. "[G]eneral information regarding schooling issues was available through family members. Many family members and friends continued to live in the Mobile area and others were known to the family . . . ."

"Several areas of inquiry were available relating to petitioner's experiences in the correctional system in Alabama. . . . Further, . . . the 'word'

had spread that counsel were looking for people who knew petitioner, and several came forward of their own volition."

"In the area of mental health, there was no significant written history. The references to family members having mental impairments was not particularly impressive. . . . [¶] [Nevertheless,] [r]outine appointment of psychiatric experts would have provided some information to dictate any additional steps that may have been in order." The referee further found, however, that "[a]ny such inquiry may not necessarily have resulted in the availability of evidence of the diagnoses of organic brain impairment, learning disorders, or of post traumatic stress disorder. The quality of standardized personality tests was not the same; the knowledge of post traumatic stress disorder was in an infancy stage, and the resulting diagnosis may not necessarily have been favorable to the petitioner."[6]

Although "petitioner's cooperativeness was a significant issue" and he had been more forthcoming with appellate counsel than with his trial counsel, the referee found nonetheless "that essentially all of the information that was presented [by petitioner at the reference hearing] could have been developed through outside sources in the absence of any cooperation from the petitioner."

> 3. *What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?*

"Trial counsel took two trips to Mobile, searching the court records for petitioner's priors, and documents relating to his background. On one such trip, they drove around petitioner's neighborhood searching for relatives or

---

[6]Although he failed to do so in the reference hearing, petitioner requests this court take judicial notice of certain materials (the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) and the Comprehensive Textbook of Psychiatry/III (3d ed. 1980)) as well as several published decisions, all of which he argues rebut the referee's conclusions regarding the development and use of posttraumatic stress disorder as a defense in criminal proceedings. Even assuming it would be appropriate to take judicial notice of matters not presented for the referee's consideration (cf. *People v. Hardy* (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781]), the psychiatric materials constitute neither "[f]acts and propositions that are of such common knowledge . . . that they cannot reasonably be the subject of dispute" (Evid. Code, § 452, subd. (g)) nor "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (*Id.*, subd. (h); cf. *Ake v. Oklahoma* (1985) 470 U.S. 68, 81 [105 S.Ct. 1087, 1095, 84 L.Ed.2d 53] ["Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness"].) Accordingly, they are not the proper subject of judicial notice. While we may judicially notice decisional law (see Evid. Code, § 452, subd. (a)), such notice does not extend to the facts of such cases when the point on which they are submitted is, as here, in dispute. Thus, we grant petitioner's request in part, but do not accord any evidentiary weight to the submission.

witnesses. They also contacted petitioner's mother and spent some time interviewing her about petitioner as well as her own history."

In her factual findings, the referee explained that petitioner's trial attorneys made only "limited" efforts to gather penalty phase evidence on petitioner's behalf. The two defense investigators worked solely on the guilt phase; the attorneys themselves did the investigative work on the penalty phase. Counsel did not have petitioner examined by a psychologist, psychiatrist, or any other mental health expert.

Both attorneys traveled to Mobile on February 4, 1983, for one day. There, they spent time searching for records relating to petitioner at the Mobile County courthouse and driving around Mobile in taxis unsuccessfully looking for relatives and "making inquiries." Miller testified that they were seeking evidence of good character and good deeds, but he could not remember precisely whom or what he and Lenoir were trying to find.[7]

On counsel's second trip to Mobile, after petitioner's first trial resulted in a hung jury, they again visited the county courthouse, where they obtained the information about petitioner's prior murder conviction. Later that day, they flew to Pensacola, Florida, where they spoke with petitioner's mother at the airport for an hour and a half or more. "Among other matters discussed, they obtained information about the fact that petitioner had been a slow learner, that he had been raised by his grandparents, and that he started getting into trouble as a teenager. . . . Counsel provided her with their business cards and . . . Mr. Miller specifically recalled that he told her they would contact her if they could convince petitioner to 'cut us loose in the investigation' to obtain more information about other family members or any others that may have helped."

4. *What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase?*

"There were no financial constraints affecting the penalty investigation. The tactical constraints were trial counsel's distaste for the use of inmate witnesses, concern for the consequential development of petitioner's acts of misconduct while incarcerated as well as the preliminary impression that a 'poverty-presentation' lacked viability. Also, the petitioner's adamant refusal to have his family involved and his threat to disrupt proceedings if his wishes were not honored impacted on counsel's tactical decisions."

The referee found "essentially no financial constraints weighing against the investigation or presentation of penalty phase evidence."

---

[7] Lenoir had died prior to the reference hearing.

"Regarding tactical constraints, the findings being limited by the absence of Mr. Lenoir's state of mind, Mr. Miller testified that he felt constrained by the adamancy of petitioner's opposition to having his family, and in particular his mother, testify at the trial. Mr. Miller was very consistent in his testimony regarding petitioner's refusal to cooperate in this area, and this position is supported circumstantially by statements made by petitioner as well as testimony from the prosecutor, Ed Ferns. Mr. Miller believed the petitioner when he threatened to be disruptive if these wishes were not accepted. Acceding to these wishes, neither he nor Mr. Lenoir pursued a full investigation of petitioner's background or family and never learned the names of family members with one or two exceptions."

In addition, Miller was "not particularly impressed" with the house or neighborhood in which petitioner grew up as providing a basis for mitigation "as it resembled the manner in which counsel had been raised." "As to the inherent problems of calling prisoners as witnesses, Mr. Miller stated he was not generally impressed with prisoners and did not want to trade 'good acts' for 'bad acts,' expressing concern about the risk of disclosure of any possible misconduct petitioner may have been personally involved in. In fact, the evidence reflected that petitioner engaged in two stabbings and escaped from custodial facilities on two occasions. From a practical standpoint, relating to Mr. Miller's reaction to prisoner-witnesses, the inmates who were called did have substantial violent criminal records and these offenses included a substantial number of escapes.

"Common themes at that time in penalty presentations included familial abuse, abandonment and institutional witnesses, although the evidence also noted that penalty trials at that time were not generally lengthy. Post-traumatic stress disorder remained in its incipient stages and was generally not used at this time except relating to Viet Nam veterans, a sharp contrast with current standards.

"The evidence further established that both trial attorneys were severely impeded in their efforts to focus on petitioner by their heavy caseloads, conducting back-to-back capital cases before and after petitioner's trial."

*5. What evidence, damaging to petitioner, but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, if petitioner had introduced any such mitigating character and background evidence?*

"Evidence would have been presented detailing the facts of petitioner's prior convictions, including the fact that he took hostages in one incident,

pointed a gun at the head of a young female then alternately at officers before surrendering, and that he took a dominant role in the robbery of a taxi driver in which he shot at the victim three times. Both of these descriptions counter the portrayal of petitioner as a victim of circumstances. Also, mental health experts would likely have been called to rebut the diagnosis of post-traumatic stress disorder and brain impairment. These experts would further have developed a different diagnosis of anti-social personality disorder and shown petitioner to be of average intelligence. They would have also presented opinions that petitioner's ability to obtain and maintain employment as well as sustaining a relationship was indicative of normal brain function, and that his activities in the course of the instant murders were not caused by brain damage or intoxication."

On this point, the referee discussed in particular the reference testimony of Harry Woodall and Tommy Pettis and the prosecution's mental health experts.

Woodall, the driver of the taxi that petitioner and Freddie Square used as their getaway car in the Alabama grocery store robbery murder, would have testified that petitioner and Square robbed him at gunpoint. While pointing the gun at Woodall, petitioner twice said, "Let's shoot him." After they stole Woodall's wallet, Square ordered Woodall out of the taxi. Three shots were fired at Woodall when he was about 30 feet away; petitioner fired at least two of them.

Mobile Police Officer Pettis testified that on March 23, 1977, he responded to a robbery call. Entering the store from which the call came, he and other officers saw petitioner holding a crying young woman hostage with a cocked gun at her head. He told the officers to leave and "continued to repeat, 'Someone's going to get shot, I'm going to shoot.'" The officers withdrew. Ultimately, petitioner surrendered to the officers after releasing the young woman and another woman whom he had also held hostage.

Psychologist Dale McNiel disagreed with the testimony of petitioner's expert, Dr. George Woods, that petitioner suffered from posttraumatic stress disorder. In Dr. McNiel's view, petitioner suffered from antisocial personality disorder, he was resentful of authority, and his IQ of 93 was within normal limits.

Dr. Reese Jones, a psychiatrist with a specialty in psychoactive drugs, testified that petitioner abused drugs but was not dependent on them. According to Dr. Jones, petitioner's actions in the year preceding the murder (his employment, his home, and his relationship with Debra Pickett, with

whom he had a son) strongly suggested that he had not suffered brain damage. His behavior on the night of the murders showed planning and thought, and it was therefore unlikely that petitioner was under the influence of PCP when he committed the murders.

6. *Did petitioner himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? If so, what specifically did petitioner request?*

"Petitioner demanded that counsel refrain from contacting or calling his mother or family members as witnesses. Petitioner threatened to disrupt proceedings if his mother were called and he personally addressed the trial judge on this issue. He indicated that he understood the consequences of this position and that it was his choice to proceed in this fashion. There were no other constraints to developing other witnesses or a mental health profile."

The referee determined that petitioner "adamantly objected to his attorneys approaching his mother and family and having them testify." She based this finding on petitioner's own statements at trial, "Miller's consistent testimony, and the testimony and impressions of the prosecutor Ed Ferns." This evidence was corroborated by petitioner's older sister, Carolyn Rivers, and uncontradicted by his mother. When the trial court specifically addressed petitioner regarding his reluctance to have his mother called and explicitly advised that his mother's testimony could be valuable, petitioner "was very precise in his response, telling the judge that he fully understood and that this was his choice and no one else's." Additionally, Lenoir represented on the record at trial that petitioner refused to have his mother called and that "he 'had his reasons,' which Mr. Lenoir did not wish to disclose to the court. Apparently Mr. Lenoir knew what these reasons were." The referee also found that "petitioner went so far as to threaten to disrupt the trial if his mother were called. Counsel acceded to these demands."

B. *Exceptions*

Both parties filed exceptions to the report, raising numerous factual questions. Because the determination of all but two of these issues is not material to our resolution of the petition, we need not address them. As for the remaining exceptions, we examine them following the standard that accords deference to factual findings supported by substantial evidence. (*People v. Mayfield* (1993) 5 Cal.4th 142, 201 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

1. *Rebuttal evidence*

Petitioner objects to the referee's finding that the People would have offered rebuttal evidence if the defense had presented the proffered mitigating evidence. The referee rejected the testimony of Prosecutor Ferns that he

would not have introduced any rebuttal evidence, with the possible exception of petitioner's second escape. In the referee's view, "This position ignores reality . . . . [T]he time constraints that hampered the prosecution at the time, such as the difficulty Mr. Ferns spoke of in retrieving priors' [sic] information, would have been alleviated by the consumption of trial time in presenting the large number of witnesses contemplated by the defense as shown in these hearings. . . . Had any defense attorney called in excess of fifty witnesses with virtually hundreds of hours of testimony portraying the defendant as a victim of life's circumstances, these rebuttal witnesses would have undoubtedly been called and presented by the prosecution during a penalty trial."

We agree with this general assessment of the realities of prosecuting a capital case. Based on the reference hearing testimony, we also conclude the thrust of the referee's finding—that the prosecutor would have responded to the mitigating evidence now proposed—is supported by substantial evidence and not necessarily inconsistent with Ferns's testimony. It appears Ferns disavowed the likelihood of rebuttal only with respect to prison conditions. He did, however, indicate he would have altered the focus of his closing argument to respond to such evidence. It is also clear from the record that much damaging testimony regarding petitioner's own violent conduct in prison and other circumstances desensitizing inmates to violence could have, and undoubtedly would have, been elicited on cross-examination. (*People v. Mayfield, supra,* 5 Cal.4th at p. 208.) Similar inferences can be drawn with respect to the mitigating evidence of family background. While it may be unlikely the prosecutor would have sought to locate rebuttal witnesses in Alabama to contradict evidence of petitioner's upbringing, the mitigating impact could nevertheless have been undermined on cross-examination and through closing argument, particularly regarding petitioner's early criminal acts. With respect to mental health rebuttal, the realities of trial surely would have prompted the prosecutor to present expert testimony in contradiction since such witnesses were generally available.

Petitioner counters that if Ferns had found the testimony of Woodall and Pettis so useful, he would have introduced it even without petitioner's presenting the mitigating evidence. Their testimony, however, did not fit with the focus of the People's case, which was not petitioner's past crimes, but the gratuitously brutal circumstances of the current ones. Given the disturbing nature of the facts, the prosecutor had little incentive to parse the details of petitioner's criminal history. Rather, as was more common in the 1980's, he emphasized the circumstances of the crimes to persuade the jury death was appropriate. If, however, the jury were to hear details of petitioner's background in mitigation, the prosecutor would reasonably want to

ensure it received a balanced and accurate picture. (See, e.g., *People v. Kipp* (2001) 26 Cal.4th 1100, 1134 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

Petitioner also asserts the testimony of Woodall and Pettis would have been inadmissible because it did not relate directly to a particular incident or character trait petitioner offered in his defense. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24 [230 Cal.Rptr. 667, 726 P.2d 113].) As to Woodall's testimony, numerous witnesses characterized petitioner as a follower and Freddie Square as a leader in their misconduct. The Woodall shooting demonstrated petitioner could and did take the initiative for violence. While the admissibility of Pettis's testimony may be somewhat closer, it too shows petitioner's lack of reluctance to use violence to obtain his ends. We therefore conclude substantial evidence supports the referee's finding that presenting the mitigating evidence would have opened the door to damaging rebuttal.

### 2. *Petitioner's curtailment of penalty phase investigation and presentation*

Petitioner disputes the referee's finding that he did not want his family involved. He claims he asked only that his mother not be called as a witness and placed no restrictions whatsoever on the use of other family members. In support of his exception, he cites statements by Lenoir and Miller to the trial court that they were honoring petitioner's request not to call his mother to testify, without any mention of other relatives. In declarations provided to petitioner's habeas corpus counsel, Lenoir and Miller both stated only that petitioner had not wanted his mother involved and that they had been unable to find any evidence of good character and good deeds; they said nothing about petitioner's desire not to have any others in his family contacted.

Even if his attorneys made little effort to discuss with petitioner the possibility of calling family members other than his mother, the referee credited Miller's testimony that petitioner objected not only to his mother's involvement, but also to that of any relatives. Giving the referee's credibility determination the "great weight" to which it is entitled (*In re Johnson* (1998) 18 Cal.4th 447, 461 [75 Cal.Rptr.2d 878, 957 P.2d 299]), we adopt the referee's finding that Miller accurately described petitioner's objection to having family members present mitigating evidence.

## IV. Discussion

In a habeas corpus proceeding, the burden of proof lies with the petitioner to prove, by a preponderance of the evidence, facts that establish

the invalidity of the judgment under which he is restrained. (*In re Cudjo* (1999) 20 Cal.4th 673, 687 [85 Cal.Rptr.2d 436, 977 P.2d 66].)

■ With respect to reference proceedings, "this court independently reviews a referee's resolution of legal issues and mixed questions of law and fact. [Citation.] Because the referee observes the demeanor of testifying witnesses, and thus has an advantage in assessing their credibility, this court ordinarily gives great weight to the referee's findings on factual questions, but this deference is arguably inappropriate when the referee's findings are based entirely on documentary evidence. [Citation.]" (*In re Cudjo, supra,* 20 Cal.4th at pp. 687-688.)

■ To prove a claim of ineffective assistance of counsel at the penalty phase trial, the petitioner "must establish that counsel's performance did not meet an objective standard of reasonableness under prevailing professional norms and that he suffered prejudice thereby. [Citation.] Prejudice is established when ' "there is a reasonable probability that, absent the errors [of counsel], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [Citations.] As in the guilt phase, reasonable probability is defined as one that undermines confidence in the verdict.' [Citation.] Alternatively, the petitioner may establish that as a result of counsel's inadequacy, the prosecution case was not subject to meaningful adversarial testing, thereby raising a presumption that the result is unreliable. [Citation.]" (*In re Gay* (1998) 19 Cal.4th 771, 790 [80 Cal.Rptr.2d 765, 968 P.2d 476]; see also *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 [104 S.Ct. 2052, 2064-2065, 2068, 80 L.Ed.2d 674] (*Strickland*).)

■ In measuring counsel's performance, the United States Supreme Court has cautioned that judicial scrutiny "must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case.

Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065]; *Bell v. Cone* (2002) 535 U.S. 685 [122 S.Ct. 1843, 152 L.Ed.2d 914].) The high court has also expressly reaffirmed that the *Strickland* standard applies to an assessment of counsel's "failure to adduce mitigating evidence and the waiver of closing argument" with respect to capital sentencing. (*Bell v. Cone,* at pp. 696-699 [122 S.Ct. at pp. 1851-1852].)

Assessing petitioner's claim in light of the referee's findings and these governing principles, we conclude petitioner "has not established that 'in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance.' [Citation.] He 'has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance.' [Citation.]" (*Burger v. Kemp* (1987) 483 U.S. 776, 795-796 [107 S.Ct. 3114, 3126, 97 L.Ed.2d 638], quoting *Strickland, supra,* 466 U.S. at pp. 690, 700 [104 S.Ct. at pp. 2065, 2071].)

In *Strickland,* the Supreme Court specifically addressed counsel's duty to investigate and made clear courts should not equate effective assistance with exhaustive investigation of potential mitigating evidence: "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland, supra,* 466 U.S. at pp. 690-691 [104 S.Ct. at p. 2066].) Concomitantly, the high court has recognized that valid strategic choices are possible even without extensive investigative efforts. (See *Burger v. Kemp, supra,* 483 U.S. at p. 794 [107 S.Ct. at pp. 3125-3126]; see also *Wiggins v. Corcoran* (4th Cir. 2002) 288 F.3d 629, 640.)

Although the referee found that counsel could have discovered the mitigating evidence presented at the reference hearing with "simple persistence," it is equally clear petitioner insisted they not involve his family. "As we have repeatedly explained, an attorney representing a defendant at the penalty phase of a capital case is not required to present potentially mitigating evidence over the defendant's objections. [Citations.]" (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Nevertheless, counsel visited Alabama and observed petitioner's childhood

home, which they considered unimpressive as a basis for a poverty defense.[8] They also contacted petitioner's mother and sought information about his background. Assuming her revelations were consistent with her reference hearing testimony, they did not depict an excessively abusive or impoverished upbringing. Counsel also had no significant documentation of any mental deficiencies petitioner might suffer.

Moreover, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." (*Strickland, supra,* 466 U.S. at p. 691 [104 S.Ct. at pp. 2066-2067]; *Burger v. Kemp, supra,* 483 U.S. at p. 795 [107 S.Ct. at p. 2136].) ▮ While counsel were aware petitioner had been incarcerated in the Alabama prison system, he did not inform them of the conditions he endured thereby alerting them to the need for further investigation of possible mitigation. Additionally, whatever mitigating evidence may have been disclosed by pursuing the conditions of incarceration petitioner experienced, counsel knew such evidence would come primarily from the testimony of petitioner's fellow prisoners, many of whom were hardened criminals with serious felony records. Such testimony also could well open the door to petitioner's own extensive criminal background.

Thus, counsel's preliminary investigation did not establish a compelling defense theory, whether considering the areas of family and background, prison conditions, and mental health singularly or collectively.

"The record at the habeas corpus hearing does suggest that [counsel] could well have made a more thorough investigation than [they] did. ▮ Nevertheless, in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.' [Citation.]" (*Burger v. Kemp, supra,* 483 U.S. at p. 794 [107 S.Ct. at p. 3126].) "The purpose [of the effective assistance guarantee of the Sixth Amendment] is simply to ensure that criminal defendants receive a fair trial." (*Strickland, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065].) Accordingly, the more important focus of our reasonableness inquiry is an assessment of the decision to forgo further investigation in light of the defense strategy counsel ultimately adopted. (See *Burger,* at pp. 794-795 [107 S.Ct. at pp. 3125-3126]; see also *id.* at p. 790, fn. 7 [107 S.Ct. at pp. 3123-3124].)

---

[8]Contrary to the implication of the dissent (see dis. opn., *post,* at p. 1274), the record contains no evidence counsel had any ulterior purpose in traveling through New Orleans to Mobile, which apparently had no direct airline connection from Los Angeles.

Instead of a lengthy presentation of a broad range of witnesses describing in detail various aspects of petitioner's background—which at the time would have been atypical for a penalty phase defense—Lenoir chose to minimize petitioner's culpability by circumscribing his background and mitigating his criminal responsibility, portraying him as a follower rather than violently antisocial. (Cf. *id.* at p. 793 [107 S.Ct. at p. 3125].) He also urged the jury to consider in mitigation the fact that others who had committed more heinous multiple murders had been sentenced to life without possibility of parole and that Sanders received a comparatively lighter sentence.

In adopting this approach, counsel not only presented a reasonable case for sparing petitioner's life under the circumstances (see *Burger v. Kemp,* *supra,* 483 U.S. at p. 795 [107 S.Ct. at p. 3126]; cf. *Wiggins v. Corcoran,* *supra,* 288 F.3d at pp. 641-642), but foreclosed the introduction of substantial aggravating evidence in rebuttal or on cross-examination that could have undermined the defense by depicting petitioner as aggressive and desensitized to violence. (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1253 [275 Cal.Rptr. 729, 800 P.2d 1159]; *People v. Miranda* (1987) 44 Cal.3d 57, 122 [241 Cal.Rptr. 594, 744 P.2d 1127], disapproved on another point in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [269 Cal.Rptr. 269, 790 P.2d 676]; see also *Burger v. Kemp, supra,* 483 U.S. at pp. 794-795 [107 S.Ct. at pp. 3125-3126]; *Darden v. Wainwright* (1986) 477 U.S. 168, 186 [106 S.Ct. 2464, 2474, 91 L.Ed.2d 144]; *Strickland, supra,* 466 U.S. at p. 700 [104 S.Ct. at p. 2071].)

This evidence included shooting at the fleeing taxi driver robbery victim without provocation after just committing the robbery murder with Freddie Square, holding a gun to a young woman's head, threatening to shoot a police officer, and stabbing other inmates. The prosecutor also could have argued this pattern of criminality—substantially accomplished prior to petitioner's incarceration in prison—demonstrated his violence was a matter of predisposition rather than circumstance and would pose a danger to others if he were sentenced to life imprisonment. (Cf. *People v. Millwee* (1998) 18 Cal.4th 96, 151-152 [74 Cal.Rptr.2d 418, 954 P.2d 990].) Additionally, evidence of prison conditions could have led to the jury's learning of petitioner's second escape from custody. Although counsel stressed that the California facility in which petitioner would serve his life sentence was more secure than the Alabama institutions of the 1960's and 1970's, multiple inflammatory references to "escape" could have created a danger defense counsel reasonably sought to avoid.

In light of the foregoing, we conclude "counsel's decision not to mount an all-out investigation into petitioner's background in search of

mitigating circumstances was supported by reasonable professional judgment. It appears that [they did pursue the potential mitigation that] had been called to [their] attention and that there was a reasonable basis for [their] strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, [they] reasonably determined that [they] need not undertake further investigation to locate witnesses who would [have made] statements about [petitioner's] past." (*Burger v. Kemp, supra,* 483 U.S. at pp. 794-795 [107 S.Ct. at p. 3126]; see also *Bell v. Cone, supra,* 535 U.S. at pp. 699-700 [122 S.Ct. at p. 1853].) ▮ As one federal appellate court has explained, "a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." (*Rector v. Johnson* (5th Cir. 1997) 120 F.3d 551, 564.)

▮ Furthermore, the evidence petitioner now argues should have been presented was not conclusively and unambiguously mitigating.[9] " ' "[M]itigation . . . ," after all, "[m]ay be in the eye of the beholder." [Citation.]' [Citation.]" (*Burger v. Kemp, supra,* 483 U.S. at p. 794 [107 S.Ct. at p. 3126].) Thus, although petitioner's mother went to Detroit to improve her circumstances when he was two years old, she did not abandon him, but left him with an extended family including his "loving and responsible" grandfather, regularly sent money and clothing to her children, and returned several years later to remain in the family home. Despite the death of his grandfather when petitioner was 10, the testimony describing his upbringing and early family life generally showed it to be relatively stable and without serious privation or abuse. All but one of his siblings completed high school, and only one had a minor brush with the law. (See *People v. Gonzalez, supra,* 51 Cal.3d at p. 1253.) His mother and other relatives also counseled against associating with bad influences such as Freddie Square. Thus, petitioner did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every time he was released or escaped from prison.

The prosecutor could have exploited the testimony of the mental health experts to petitioner's disadvantage as well. As the reference hearing testimony demonstrated, the evidence of mental difficulties was subject to dispute and would likely have reduced to a proverbial "battle of the experts." Although the referee found one of petitioner's experts, Dr. John Irwin, "one of the most compelling witnesses presented by the defense and his presentation and demeanor . . . impressive," his testimony was limited to the

---

[9]As explained, *ante,* at page 1251, even without rebuttal witnesses, the prosecutor could have elicited facts on cross-examination to deflate the mitigating impact of this evidence.

impact of the prison system and the ability of inmates to succeed outside the system. In part, he explained that convicts tend to react with rage to perceived insults, behavior they find difficult to shed even when discharged. Many of the inmate witnesses at the reference hearing confirmed this experience. While this might explain why petitioner reacted violently when Wheeler called him a "faggot" and a "punk," it does not necessarily create a sympathetic impression. The jury could just as readily infer petitioner was unable to control lethal impulses on the slightest provocation. In addition, the prosecution's expert, Dr. McNiel, challenged the diagnosis of petitioner as suffering from various mental disorders and concluded he simply "showed longstanding antisocial personality traits." He rejected the description of petitioner as "dull normal" and testified his 93 IQ was "low average." Dr. Jones agreed petitioner did not exhibit any evidence of brain damage, citing the fact he had successfully obtained and worked at a job, maintained a residence, and established a relationship. As the reference hearing demonstrated, a mental health penalty defense would also have given the prosecution several opportunities to repeat the circumstances of the crime as well as petitioner's past criminality in questioning the experts on both direct and cross-examination as to whether petitioner exhibited an antisocial personality rather than some form of mental impairment. (See *Darden v. Wainwright*, *supra*, 477 U.S. at p. 186 [106 S.Ct. at p. 2474].)

With respect to prison conditions, while the evidence leaves no doubt petitioner endured horrifically demeaning and degrading circumstances, this evidence could equally have proved a double-edged sword, as the referee found. Presenting testimony about petitioner's abusive prison experiences would have required counsel to call a series of witnesses, including one death row inmate, with serious felony records for murder, rape, and armed robbery, potentially drawing an unfavorable comparison with petitioner. At the very least, their criminal histories would automatically subject them to impeachment. (Evid. Code, § 788.) Many had themselves engaged in brutality while in prison and escaped with some frequency—again, in negative respects similar to petitioner. Rather than engendering sympathy, the evidence could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law. (Cf. *Darden v. Wainwright*, *supra*, 477 U.S. at p. 186 [106 S.Ct. at p. 2474].) It also would raise the question of why petitioner so readily resorted to crime when he escaped the brutal and predatory conditions in Alabama and relocated to California, where he found work and started a family. In the same vein, petitioner's abandonment of his own son to pursue a cocaine habit and his former criminal ways would belie the suggestion he merited sympathy due to his parents' drinking and abandonment and his grandfather's death.

When "evaluat[ing] the conduct from counsel's perspective at the time" (*Strickland, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065]), we must also consider the nature of the aggravating evidence, particularly the circumstances of the crime. Here, the facts of petitioner's crimes evinced a callous disregard for human life. None of the three murders was an impulsive reaction to a situation unexpectedly out of control. (Cf. *People v. Dillon* (1983) 34 Cal.3d 441, 482-483 [194 Cal.Rptr. 390, 668 P.2d 697].) Rather, petitioner essentially lured the victims with a false sense of normalcy before brutally ending their lives. Nor was his motive simply robbery; he also raped and sodomized Brandon before killing her and murdered both Wheeler and Chism with considerable violence and evident sangfroid. Any penalty phase strategy must take into account the jury's likely state of mind on having only recently heard an account of the defendant's capital crimes and returned a guilty verdict. (Cf. *People v. Cox* (1991) 53 Cal.3d 618, 661 [280 Cal.Rptr. 692, 809 P.2d 351] [no ineffective assistance of counsel in failing to present guilt phase defense when counsel could anticipate guilty verdict and might need to preserve credibility of penalty phase theory that codefendant orchestrated killings].)

On these facts, we conclude counsel's strategic decision to limit the scope of their investigation of mitigating background evidence and not to present such evidence at the penalty phase came within "the wide range of reasonable professional assistance." (*Strickland, supra,* 466 U.S. at p. 689 [104 S.Ct. at p. 2065]; see *People v. Miranda, supra,* 44 Cal.3d at pp. 120-123.) Furthermore, as in *People v. Miranda, supra,* 44 Cal.3d at page 122, petitioner "fails . . . to point to any evidence unknown to counsel which would have been discovered from such investigation and which would have influenced counsel's decision." All the purportedly mitigating evidence proffered on habeas corpus "would [have the] same . . . damaging result" counsel would have sought to avoid by adopting a different penalty phase strategy. (*Ibid.*) For example, testimony that petitioner's prison experience may have prompted him to rape and sodomize Brandon in retaliation for Wheeler's referring to him as a "faggot" might have given his acts an understandable context, but not a particularly sympathetic one because it could also confirm petitioner as an antisocial personality. (See, e.g., *Burger v. Kemp, supra,* 483 U.S. at p. 793 [107 S.Ct. at p. 3125]; *Wiggins v. Corcoran, supra,* 288 F.3d at p. 642.) A reasonable defense strategy would have kept this perception from the jury. For the same reasons, it is not "reasonabl[y] proba[ble]" (*Strickland,* at p. 694 [104 S.Ct. at p. 2068]) petitioner was prejudiced by counsel's rejection of a defense premised on evidence of petitioner's upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal.

This conclusion is consistent with our assessment of comparable facts in other decisions. For example, in *People v. Gonzalez, supra,* 51 Cal.3d at page 1251, counsel declined to present evidence of the defendant's family life, which was loving, stable, and nonabusive and thus not particularly mitigating. In doing so, counsel kept the jury from hearing evidence suggesting the defendant's possible involvement in a rape and a shooting. (*Id.* at pp. 1248-1253.) We found that "[u]nder all the circumstances, . . . counsel's decision to avoid damaging 'rape' evidence by omitting available character and background evidence was within the range of reasonable competence." (*Id.* at p. 1253.)

In *In re Jackson* (1992) 3 Cal.4th 578 [11 Cal.Rptr.2d 531, 835 P.2d 371], disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 545, footnote 6 [37 Cal.Rptr.2d 446, 887 P.2d 527], the defendant's childhood was quite appalling and included physical abuse and frequent uprooting (*In re Jackson,* at pp. 606-609), unlike petitioner's relatively stable home environment. Nevertheless, we deemed it reasonable that counsel, had he investigated, would nevertheless have withheld this evidence to prevent the jury from learning of the defendant's assault on two women a year before the murders. (*Id.* at pp. 613-615.)

Perhaps the most apposite precedent is *In re Ross* (1995) 10 Cal.4th 184 [40 Cal.Rptr.2d 544, 892 P.2d 1287], in which the jury convicted the defendant of three murders as well as other associated crimes. As here, the defense called no penalty phase witnesses but presented certain evidence through stipulation, including the fact that an accomplice, who personally used a firearm during the crimes, did not receive a death sentence and that the defendant was 21 years old when he committed the murders. (*Id.* at p. 189.) We rejected the argument counsel was ineffective for failing to present mitigating evidence regarding Ross's upbringing. The evidence was not only subject to impeachment—potentially leaving Ross worse off (*id.* at p. 206)—it would also have triggered damaging rebuttal, including evidence of sustained juvenile petitions for four counts of robbery and one count of brandishing a weapon, and other sustained petitions involving burglaries of guns. (*Id.* at pp. 206-207; cf. *People v. Mayfield, supra,* 5 Cal.4th at pp. 207-208 [finding no prejudice because additional defense witnesses could have "done severe damage to the penalty defense" on cross-examination].) In addition, we noted the circumstances of the murders, which were "not sudden explosions of angry violence or psychopathic serial killings" but calculated killings during a robbery and burglary. (*In re Ross,* at p. 213.) Moreover, "there was no compelling connection between [the mitigating evidence not introduced at the penalty phase] and the crimes . . . ." (*Ibid.*) On a substantially similar record, we reach the same conclusion that petitioner did not receive ineffective assistance of counsel.

This determination also comports with the decision in *Burger v. Kemp,* *supra,* 483 U.S. 776, in which the United States Supreme Court found no deficiency in counsel's performance at the penalty trial. In that case, counsel declined to present evidence of the defendant's " 'neglectful, sometimes even violent, family background' and testimony that his 'mental and emotional development were at a level several years below his chronological age' . . . ." *(Id.* at p. 789, fn. 7 [107 S.Ct. at p. 2123].) Such evidence would have risked "introducing facts [such as his difficulties with the law as a juvenile] not disclosed by [defendant's] clean adult criminal record." *(Id.* at p. 793 [107 S.Ct. at p. 3125].) For similar reasons, counsel declined to call the defendant as a witness. The defendant had never expressed remorse and apparently enjoyed talking about the crimes, which might have caused the jury to view his attitude as indifference or worse. *(Id.* at pp. 791-792 [107 S.Ct. at pp. 3124-3125].) Evidence of the defendant's mental deficiencies could also have been deleterious because it would have demonstrated his " 'unpredictable propensity for violence which played a prominent role in the death of [the] victim.' " *(Id.* at p. 794 [107 S.Ct. at p. 3126].) On this record, the high court found the mitigating evidence "by no means uniformly helpful to [the defendant] because [it] suggest[ed] violent tendencies that are at odds with the defense's strategy of portraying [the defendant's] actions on the night of the murder as the result of [his accomplice's] strong influence upon his will." *(Id.* at p. 793 [107 S.Ct. at p. 3125].)

The facts of this case offer even more compelling justification to forgo presenting background evidence in favor of a strategy to mitigate petitioner's culpability by minimizing the jury's exposure to his criminal history. The defendant in *Burger* endured a worse childhood and committed only one murder. He was still a teenager at the time of the crime; and his codefendant was primarily responsible for the plan to kidnap the victim, the sexual abuse inflicted, and the decision to kill. *(Burger v. Kemp, supra,* 483 U.S. at p. 779 [107 S.Ct. at pp. 3117-3118].) Rather than attribute his culpability to family or mental health problems, counsel sought instead to minimize it in light of the codefendant's dominance. The United States Supreme Court found this decision reasonable under the circumstances. Whether or not counsel could have undertaken a more thorough investigation, " '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.' [Citation.]" *(Id.* at p. 794 [107 S.Ct. at p. 3126].) Applying similar reasoning, we reach the same conclusion on comparable facts. (See *Campbell v. Kincheloe* (9th Cir. 1987) 829 F.2d 1453, 1462-1463 [upholding counsel's omission of evidence of the defendant's abuse as a child, childhood medical problems, history of drug and alcohol abuse, attempted suicide, and father's alcoholism, which foreclosed substantial aggravating evidence in rebuttal].)

Reaffirming this standard, the Supreme Court also declined to find ineffective assistance of counsel in *Bell v. Cone, supra,* 535 U.S. 685 [122 S.Ct.

1843], where counsel presented no penalty phase evidence and waived closing argument. Viewing the record in its entirety and the totality of the circumstances from the perspective of counsel at the time of trial, the court found both decisions within the range of reasonable strategy. For example, with respect to the failure to call background witnesses, counsel "feared that testimony about [the defendant's] normal youth might, in the jury's eyes, cut the other way." (*Id.* at pp. 699-700 [122 S.Ct. at p. 1853]; see *Darden v. Wainwright, supra,* 477 U.S. at pp. 185-186 [106 S.Ct. at pp. 2473-2474].) The court also noted that by waiving closing argument, counsel foreclosed the lead prosecutor, "who all agreed was very persuasive," from additional argument "depict[ing] his client as a heartless killer just before the jurors began deliberation." (*Bell v. Cone,* at pp. 701-702 [122 S.Ct. 1854].) In finding no deficiency in this representation, the court reiterated its cautionary admonition in *Strickland* "that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight. [Citation.]" (*Bell v. Cone,* at pp. 701-702 [122 S.Ct. at p. 1854].)

Here, Miller viewed petitioner's childhood surroundings as unimpressive because he found them comparable to his own. Counsel also had concern that having inmates describe the Alabama prison conditions would simply "trade 'good acts' for 'bad acts' " and potentially open the door to additional evidence of petitioner's criminal past. Under these circumstances, counsel could reasonably reject a background mitigation strategy in favor of an alternate basis to plead for petitioner's life. (See *Darden v. Wainwright, supra,* 477 U.S. at p. 186 [106 S.Ct. at p. 2474]; cf. *Williams v. Taylor* (2000) 529 U.S. 362, 396 [120 S.Ct. 1495, 1514-1515, 146 L.Ed.2d 389].) Similar reasoning applies to Lenoir's relatively brief closing argument—consistent in both tone and length with the limited penalty phase presentation of both the prosecution and the defense—which may have prompted the prosecutor to forgo his final statement, thereby leaving the defense with the last words to the jury. (Cf. *Bell v. Cone, supra,* 535 U.S. at pp. 701-705 [122 S.Ct. at pp. 1854-1855] [declining to find counsel's decision to waive closing argument unreasonable under the circumstances].) Moreover, we have never equated length with effectiveness. (See *People v. Mayfield, supra,* 5 Cal.4th at p. 186.) In sum, strategic forbearance is not "inaction." (Dis. opn., *post,* at p. 1274.)

We find petitioner's reliance on *In re Marquez* (1992) 1 Cal.4th 584 [3 Cal.Rptr.2d 727, 822 P.2d 435] inapposite. (See *In re Ross, supra,* 10 Cal.4th at pp. 214-215.) The facts of *Marquez*—both at trial and on habeas corpus—stand in sharp contrast to this case. The mitigating evidence of the defendant's childhood had no disadvantage or risk of impeachment or contradiction. Instead of showing he had endured experiences that may have

desensitized him to violence, the background evidence demonstrated his "generosity, his consideration of others, and his capacity for hard work." (*In re Marquez*, at p. 602.) The circumstances of the crime were not as aggravated as here; nor were prior convictions or uncharged acts of criminal violence at issue. Counsel could therefore credibly argue that the defendant's offenses were atypical rather than evidence of an antisocial personality. When offered the opportunity to argue mitigation, however, counsel simply stated "he had 'nothing more' to add." (*Id.* at p. 607.)

Nor does *In re Gay, supra*, 19 Cal.4th 771, support petitioner's argument. In that case, defense counsel—apart from his other shortcomings—persuaded the defendant to confess to a series of robberies, which not only became penalty phase factors in aggravation but also bolstered the prosecution's theory the defendant killed the police officer victim to avoid arrest and imprisonment. (*Id.* at p. 827.) In addition, counsel "fraudulently and unethically maneuvered his own appointment to defend petitioner, [thereby causing petitioner to lose] any possibility of a fully developed penalty phase defense. [Citation.] He was saddled with an attorney who abandoned hope before any attempt to craft a penalty defense was undertaken." (*Id.* at p. 828.) Counsel apparently had a capping relationship with both his assistant, who initially arranged his representation of the defendant, and with the mental health expert he retained, "who accepted only with the understanding that the case would not be complicated and would not place demands on his time." (*Ibid.*) Counsel also "labored under a second and undisclosed potential conflict of interest—he was being investigated for misappropriation of client funds by the office of the same district attorney who was his adversary in the prosecution of petitioner." (*Ibid.*) Cumulating these deficiencies with the failure to investigate and present any reasonable penalty phase defense and the absence of any trial strategy explaining the failure, the court concluded there was "a reasonable probability that absent counsel's numerous failings and the conflicts of interest with which he was burdened, a different penalty verdict would have been reached." (*Id.* at p. 830, fn. omitted.) The current facts are in no respect comparable.

*Williams v. Taylor, supra*, 529 U.S. 362, also does not assist petitioner. There, the United States Supreme Court found counsel provided ineffective representation during the sentencing trial by failing to investigate and present evidence of the defendant's "nightmarish childhood," model behavior while imprisoned, and borderline mental retardation. (*Id.* at pp. 395-396 [120 S.Ct. at pp. 1514-1515].) Although petitioner urges a similar result should follow here, the facts of *Williams* are plainly distinguishable.

To begin, counsel's investigation in *Williams* was not limited either by inconclusive results or affirmative curtailment by the defendant; it was

essentially nonexistent due to an incorrect understanding of the law. (*Williams v. Taylor, supra*, 529 U.S. at pp. 395-396 [120 S.Ct. at pp. 1514-1515].) Reasonable investigation would have uncovered an extremely harsh family life, qualitatively worse than petitioner's. (*Id.* at p. 395, fn. 19 [120 S.Ct. at p. 1514].) Williams's father beat him severely, and both parents were imprisoned for felony child abuse. (*Id.* at p. 395 [120 S.Ct. at p. 1514].)

Counsel had no tactical reason for withholding evidence regarding Williams's life in prison. Unlike petitioner's experiences, which might lead a jury to conclude his violence had become an established character trait, Williams received commendations "for helping to crack a prison drug ring and for returning a guard's missing wallet." (*Williams v. Taylor, supra*, 529 U.S. at p. 396 [120 S.Ct. at p. 1514].) Prison officials described Williams "as among the inmates 'least likely to act in a violent, dangerous or provocative way.' " (*Ibid.*) The evidence of Williams's mental disability, unlike petitioner's, was substantially quantified; he was considered "borderline mentally retarded" and did not advance beyond sixth grade. (*Ibid.*)

Perhaps most important, the risk of damaging rebuttal was significantly less. Nor does it appear counsel proffered an alternate strategy for this reason. Although some potentially aggravating evidence about Williams's background existed, it involved minor juvenile misconduct. Thus, the possible harm was minimal. (*Williams v. Taylor, supra*, 529 U.S. at p. 396 [120 S.Ct. at pp. 1514-1515].) Aiding and abetting larceny and pulling a false fire alarm pale in comparison to petitioner's shooting at a fleeing robbery victim, placing a gun to a hostage's head, threatening to kill a police officer, and prison stabbings. The jury may well retain sympathy despite learning of the former; it may well not in the case of the latter.

Not only was counsel's representation in *Williams* obviously deficient, the prejudicial impact was greater. In contrast to petitioner's brutal triple murder, "Williams turned himself in, alert[ed] police to a crime they otherwise would never have discovered, express[ed] remorse for his actions, and cooperat[ed] with the police after that." (*Williams v. Taylor, supra*, 529 U.S. at p. 398 [120 S.Ct. at p. 1515].) In light of the substantial mitigating evidence and minimal disadvantage in presenting it, the high court found " 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." (*Id.* at p. 399 [120 S.Ct. at p. 1616].) For the reasons previously discussed, we do not reach a similar conclusion on substantially dissimilar facts.

We also find recent Ninth Circuit Court of Appeals decisions distinguishable even if we assume they are correct.

In *Silva v. Woodford* (9th Cir. 2002) 279 F.3d 825, the court found ineffective assistance at the penalty phase due to counsel's failure to engage in any significant investigation of mitigating evidence regarding Silva's family background, mental health history, drug usage, and incarceration record. Counsel apparently limited the investigation based on Silva's request not to contact his relatives (*id.* at p. 839), but the court determined the decision was nevertheless not reasonable. (Cf. *Strickland, supra,* 466 U.S. at p. 691 [104 S.Ct. at pp. 2066-2067].) The court found Silva had requested only that counsel not call his parents as witnesses; he did not object to counsel's contacting them for informational purposes or calling other relatives as witnesses. (*Silva v. Woodford,* at pp. 839-840.) At the same time, counsel's "trial 'strategy' was based entirely on an overbroad acquiescence in his client's demand that he refrain from calling his parents as witnesses." (*Id.* at p. 846.) The evidence also did not show that the abandonment of the investigation was based on the defendant's informed and knowing judgment. (*Id.* at pp. 840-841.) Finally, the Ninth Circuit Court of Appeals found counsel's deficient investigation was likely prejudicial in part because the jury specifically asked the court about the actual effect of a sentence of life imprisonment without parole and appeared to be seriously considering that sentence. (*Id.* at pp. 849-850.)

By contrast in this case, counsel here did perform some background investigation, including an interview with petitioner's mother despite his objection, after which they pursued a different penalty defense—one that would have been compromised by background mitigation evidence. The referee expressly found not only that petitioner "personally adamantly objected to his attorneys approaching his mother and family and having them testify" but also that his on-the-record statements reflected he understood the consequences of his decision. With respect to the question of prejudice, in addition to the reasons previously discussed, the record here contains no indication the jury was inclined to sentence petitioner to life imprisonment and might have been persuaded by additional or alternate mitigation evidence.

In *Turner v. Calderon* (9th Cir. 2002) 281 F.3d 851, counsel failed to present evidence of the defendant's long-term drug use and its effects on various aspects of his behavior. (See *id.* at pp. 892-894.) Nevertheless, the district court denied the defendant an evidentiary hearing, which left the reviewing court with no record as to the nature and extent of any investigation or penalty strategy. (*Id.* at p. 895.) Because counsel may have been

incompetent in not presenting the drug use evidence in conjunction with information about the defendant's abusive childhood, and the omission could have been prejudicial, the court found he was entitled to an evidentiary hearing. (*Ibid.*) Here, the record is clear counsel made a sufficient investigation to adopt an alternate strategy—one inconsistent with the theory now proposed by petitioner—and that further investigation would not reasonably have influenced that decision. (See, e.g., *Wiggins v. Corcoran, supra,* 288 F.3d at p. 642.) As this court concluded in *People v. Miranda, supra,* 44 Cal.3d at pages 122-123, "the information an investigation would have disclosed would only have confirmed counsel's tactical decision not to open the 'Pandora's Box' of [petitioner's] violent background. This decision, as we have determined, was within the range of reasonably competent assistance. (Cf. *Burger v. Kemp*[, *supra,*] 483 U.S. [776]; *Strickland v. Washington, supra,* 466 U.S. at pp. 699-700 [80 L.Ed. 2d at p. 701].)" (Fn. omitted.)

## V. OTHER CLAIMS

Because our order to show cause, and our subsequent reference order, were confined to specific claims of ineffective assistance of counsel, we do not address herein either the merits of any other claims set forth in the petition, or any procedural bars that might apply to such claims. The petition for writ of habeas corpus itself will be resolved, as is our normal procedure, by a separate order.

## VI. CONCLUSION

The petition for writ of habeas corpus is denied and the order to show cause is discharged.

Baxter, J., Werdegar, J., Chin, J., and Morrison, J.,* concurred.

**KENNARD, Acting C. J.,** Dissenting.—I disagree with the majority that petitioner's attorneys competently represented him at the penalty phase of petitioner's capital trial.

Petitioner's attorneys did not call a single witness at the penalty phase. Why? The answer: They had done virtually no penalty phase investigation, so they had no witnesses to present. The two defense investigators had worked only on the guilt phase of trial; and counsel had consulted no psychiatrists, psychologists, neurologists, or other experts who might have been able to offer some insight as to why petitioner committed the three

---

*Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

murders in this case. The one potential witness interviewed by defense counsel was petitioner's mother, but counsel knew beforehand that petitioner did not want her to testify.

An investigation into petitioner's background would have revealed substantial mitigating evidence. For instance, in 1964, after a joyriding conviction at the age of 14, petitioner was sent to the Alabama Industrial School for Negro Children, which a federal judge testifying at the reference hearing described as a "penal colony for children." An investigation would also have revealed that beginning in 1966 when petitioner was 16, he spent almost 10 years in the Alabama penal system. In the 1970's, a federal court found prison conditions in Alabama to violate the Eighth Amendment's prohibition against cruel and unusual punishment.

This mitigating evidence could and should have been presented by defense counsel, and their failure to do so may well have altered the outcome at the penalty phase of petitioner's trial. Thus, unlike the majority, I would grant the petition for habeas corpus relief and vacate petitioner's sentence of death.

I

The majority's clinically cold and cursory recitation of the evidence petitioner presented at the reference hearing does not adequately portray the mitigating nature of that evidence, which I therefore discuss in detail below.

Petitioner was born in 1950 to alcoholic parents who separated soon after his birth. Petitioner and his two siblings were left in the care of their grandparents and their aunt, who lived in a poor, segregated area in Mobile, Alabama.

When petitioner was about 10 years old, his mother, who had moved to Detroit, returned to Alabama with two children by another marriage and started living with petitioner and his grandparents. Less than a year later, petitioner's grandfather, described by the referee in this case as a "pivotal figure" in petitioner's life, died. Petitioner grieved for his grandfather. He felt rejected by his mother and was jealous of her new children. He became withdrawn and began skipping school. Based on his involvement in a car theft at the age of 14, a juvenile court committed him to the Alabama Industrial School for Negro Children, a reform school known as Mount Meigs.

Federal District Court Judge Ira Dement, who in the late 1960's (before he became a judge) had participated in litigation pertaining to the appalling

conditions at Alabama's Mount Meigs reform school, testified at the reference hearing that the institution was a "penal colony for children."

Denny Abbott was a juvenile probation officer in the early 1960's when petitioner was at Mount Meigs, and he would visit Mount Meigs once or twice a month. Later he became Regional Director for the Bureau of Detention with the Florida Department of Youth Services, where he supervised six juvenile facilities. At the reference hearing, Abbott described Mount Meigs as "by far, by far . . . the worst facility I have ever seen," a "slave camp for children" run by "illiterate overseers." The children were beaten "all the time" with, among other things, broomsticks, mop handles, and fan belts. There were no vocational programs, no counseling, and virtually no education. Instead, the children were put to work in the fields, picking cotton and tending vegetables. There was little supervision of the children at night, and there was "a lot of sexual abuse of children."

Thirteen of the witnesses who testified at the reference hearing were former inmates at Mount Meigs; seven of them were there at the same time as petitioner. They uniformly corroborated Probation Officer Abbott's testimony about the horrific conditions at Mount Meigs. They mentioned getting beaten with sticks (sometimes lead-filled), bullwhips, and fan belts, often for trivial matters such as failing to pick their quota of cotton, hitting the wrong note in the band or chorus, talking too loudly, or starting to eat before everyone had sat down at the table. There were open sewage ditches next to the facility, and the children were periodically required to wade into the ditches to cut sprouting grass. When a boy failed to pick his quota of cotton or was disobedient in the fields, the overseer would poke a hole in the ground and order him to lie down, to pull down his pants, and to stick his penis into the hole. The overseer would then beat the boy's thighs with a stick, often until the skin burst open. One witness remembered seeing petitioner beaten in this manner.

Chastain Raines, who was at Mount Meigs at the same time as petitioner, testified that after the nurse at Mount Meigs quit, he, at age 15, became the head nurse, giving injections, bandaging wounds, and stitching cuts.

The witnesses who knew petitioner at Mount Meigs described him as passive and avoiding violence whenever possible; they mentioned that he was subjected to substantial sexual pressure because of his youth, his slight build, and his good looks. Oliver Grigsby explained what was meant by "sexual pressure": "Jesse was . . . an attractive kid. And by having a lighter complexion and the way that he walked and the way that he carried his self, he was good for harems . . . . So, the dogs from another geographical

region [petitioner was from Mobile, and Mount Meigs was dominated by boys from Birmingham] . . . says, well, we'll antagonize him any means we can."

After petitioner's release from Mount Meigs at the age of 16, he became withdrawn and uncommunicative. He began to associate with older, street-wise boys, including one Freddie Square. In September 1966, three months after petitioner's release from Mount Meigs, Square and petitioner robbed a grocery store clerk, whom Square then shot and killed. While fleeing from the scene, they robbed a taxi driver. Freddie Reed, who was a friend of petitioner's and was present when the grocery store robbery was planned, testified that the robbery was Square's idea; Reed saw petitioner cry right after the robbery.

Based on these incidents, petitioner was convicted of murder and robbery, and he spent nearly a decade in the Alabama penal system. The referee in this case described the prison conditions as "abysmal," based on, among other things, "severe overcrowding, racial segregation, substandard facilities, no separation of the tougher inmates from younger or smaller inmates, constant violence, the persistent threat of sexual assaults . . . the availability and necessity of weapons by all inmates, and degrading conditions in disciplinary modules." In prison, petitioner suffered beatings and sexual assaults.

Reference witness Dr. Carl Clements had worked for two and a half years in the Alabama prison system before obtaining a doctorate in psychology and joining the faculty at the University of Alabama. As a consultant with the American Civil Liberties Union's National Prisons Project, he visited Alabama prisons during the period of petitioner's incarceration, and he testified as an expert witness in litigation in the 1970's raising constitutional challenges to the conditions in those prisons. He later assisted the United States Department of Justice in prison litigation. Of the 10 to 15 prison systems he evaluated, all were found to have unconstitutional conditions; with the possible exception of prisons in Puerto Rico, the prisons in Ala-bama were the worst. When petitioner entered the prison system, it was newly integrated and many of the White prison guards resented the Black prisoners, whom they called "things" and "niggers." The prevailing view among both staff and inmates was that an inmate who was raped "deserved" it because he was "not man enough to fight."

Dr. Clements mentioned that inmates with disciplinary problems were put in cells called "doghouses." At Atmore Prison, where petitioner served part of his sentence, the doghouses were five feet wide by nine feet long. Dr.

James Thomas, a physician at Atmore, recalled seeing as many as 30 inmates in a doghouse cell, packed so tightly together that they had to sleep standing up. He described conditions at the overcrowded and rat-infested prisons as "so debilitating" that they deprived inmates of "any opportunity to rehabilitate themselves or even to maintain the skills already possessed." Sexual assaults on younger inmates were common, and Dr. Thomas would treat two to three cases of badly torn rectums a week.

Theodore Gordon, who had worked with Dr. Clements in a class action suit on behalf of inmates of the Alabama State Prison system, and Father Thomas Weise, a Roman Catholic priest who visited Atmore and the adjacent Holman Prison while petitioner was an inmate there, testified that the prisons were severely overcrowded and that most of the inmates carried weapons.

Witness Dr. Craig Haney, a psychology professor at the University of California at Santa Cruz and an expert in evaluating prison systems, reviewed reports by corrections experts describing conditions in the Alabama prison system while petitioner was incarcerated there. Dr. Haney testified he had "not encountered anything that approximates what was described as existing in Alabama," that the Alabama prison system was a "national disgrace," and that it was either "the worst" or "among a handful of the worst" prison systems in the United States.

Twenty witnesses who had been in the Alabama prisons with petitioner described the prisons as terribly overcrowded, unsupervised, and incredibly violent, with prisoners carrying knives in full view of the guards. Whenever inmates at Atmore Prison, where petitioner spent time, would complain about sexual assaults, the warden's response was to "get you a knife" or "be a wife," meaning that an inmate should either "fight for [his] manhood or submit." Knife fights and killings were common (one inmate described six unrelated prison murders that he and petitioner had witnessed), and prisoners learned to live in a constant state of tension akin to that encountered by soldiers in combat.

The inmate witnesses described petitioner as passive and not a troublemaker. Petitioner was subject to constant sexual pressure because of his youth, his slight build, his good looks, and his desire to get along with others. As inmate Richard English put it, petitioner was "just like a little sheep among wolves, a baby among a bunch of grownups," who was subject to sexual pressure because he was "young, good looking," and "tender." And in the words of Dr. James Thomas, a physician at Atmore and Holman Prisons where petitioner was housed, "[a] single young fledgling like [petitioner] would be raped many times if he didn't have some sponsor."

Petitioner also presented evidence that he was repeatedly raped in prison.

Inmate James White testified that in the late 1960's he was in the Mobile County Jail in Alabama. In the cell next to his were petitioner and an inmate named Eugene Minifield. White heard the sounds of someone being thrown against the wall, and he heard Minifield threaten to kill petitioner unless petitioner had sex with him. White then heard moans and grunts characteristic of sexual activity, after which he heard Minifield ordering petitioner to "eat my ass." A short time later, White heard petitioner crying.

Inmate Willie Spencer testified that while in Holman prison between 1970 and 1972, he saw several inmates, two of whom ("Blako" White and Sam Crayton) had a reputation for raping prisoners, carry petitioner, who was struggling, into a cell. When Spencer drew back a sheet the inmates had draped over the cell door to conceal their activities, he saw that petitioner, while still struggling, had been thrown on a bunk bed with his pants pulled off. Another prisoner, Bobby Lee Dubose also testified that he saw petitioner being dragged into the cell; although he did not look inside, he could hear petitioner struggling and asking the other prisoners to stop.

Yet another Holman prisoner, Eugene Simpson, testified that sometime between 1970 and 1972 he heard that a group of inmates planned to rape petitioner in the prison's dental laboratory. He went to the laboratory, where he found petitioner, crying, fearful, and stripped to his shorts, surrounded by inmates with knives. Simpson persuaded them to let petitioner go.

And Holman prisoner Roosevelt Youngblood testified that in 1970 he saw "Flame" Seagers, who had a reputation for sexually assaulting young inmates, drag petitioner into a cell. A blanket was draped over the door, a method customarily used in the prison to conceal forcible sexual acts. Youngblood heard sounds of someone being pushed against a wall or a bed.

Based on the inmate witnesses' testimony about petitioner's conduct in prison, the referee here made this finding: "Although there were a number of inconsistencies concerning exactly what petitioner personally experienced, it was undisputed that he was rarely the instigator of violence. On the contrary, the evidence showed that he avoided violence and appeared to adjust well when the structure permitted and that he would continue to do so. His small stature made him the target of more violent inmates in virtually every institution in which he was housed. However, when circumstances permitted, he tended to hold positions of responsibility. To the extent that he was involved in prison violence personally, the evidence remains consistent that he was the prey rather than the predator."

In 1976, petitioner was released from prison in Alabama. Soon he was arrested for an attempted robbery of a laundromat, a crime the referee in this case described as "an unsophisticated, botched effort which involved taking a young woman hostage at gunpoint and threatening responding police officers." Petitioner escaped from jail and fled to California, where he found a job and for a short time had a stable relationship with a woman named Debra Pickett, with whom he had a child. He then became a cocaine user and left Pickett. Shortly thereafter, he committed the three murders in this case.

At the reference hearing, expert witnesses testified about the psychological and neurological effects of petitioner's childhood, his experiences at Alabama's Mount Meigs reform school and in its prison system, and his abuse of controlled substances.

Dr. George Woods, a psychiatrist, expressed his opinion that petitioner might have suffered from fetal alcohol effect and in utero trauma; that organic brain damage hindered his academic development; and that he had posttraumatic stress disorder (PTSD), caused by his experiences at Alabama's Mount Meigs reform school and in Alabama prisons. Dr. Woods noted from the police reports that during a confrontation between petitioner and victim Wheeler a short time before the three murders, Wheeler had called petitioner a "faggot." In Dr. Woods's view, petitioner's PTSD would predispose him to overreact to the slur, and petitioner was affected by serious emotional disturbance when he committed the murders.

In the opinion of Dr. Craig Haney, a psychologist, the brutal conditions petitioner experienced as a teenager at Alabama's Mount Meigs reform school had caused psychological damage. Having neither job skills nor social skills, it was inevitable that petitioner would get in trouble with the law.

According to Dr. James Park, a clinical psychologist, petitioner had behaved well in a structured setting, and he would make an above-average adjustment to a sentence of life in prison were he to receive such a term.

Dr. Dorcas Bowles, the Dean of the School of Social Work at the University of Texas at Arlington, testified that petitioner was adversely affected by parental abandonment, by the death of his grandfather (whom he regarded as a father figure) when he was 10 years old, by organic brain impairment, and by the brutal conditions at Alabama's Mount Meigs reform school.

Dr. John Irwin was a retired sociology professor who, before going to college, had spent five years in prison for armed robbery. He mentioned the

difficulties encountered by former prisoners, particularly those who have been incarcerated for most of their adolescence, in adjusting to life outside of a penal institution. Such persons are "socially crippled" because the cultural values that allow them to survive in an institutional setting make it difficult for them to adapt to conditions in the outside world. Dr. Irwin contrasted California's rehabilitative programs, which had enabled him to overcome his prison background, with the conditions petitioner experienced in Alabama, where nothing was done to prepare petitioner for reintegration into society. Dr. Irwin cited statistics showing that the recidivism rates for persons released from Alabama prisons in the 1970's (when petitioner was released) were much higher than those in the country as a whole. The referee found Professor Irwin's testimony "compelling" and said his "presentation and demeanor were impressive."

In the opinion of Dr. Myla Young, a clinical psychologist employed by the State Department of Mental Health to review neuropsychological tests of prison inmates, petitioner had brain impairment that was "mild" in some areas and "moderate" in others. She found no indication that petitioner was a sociopath or psychopath. She mentioned that petitioner's answers to a battery of evaluative tests showed that he was not malingering.

## II

Had petitioner's trial attorneys made the effort, they could easily have discovered the substantial and compelling mitigating evidence described above. The referee noted that the steps *appellate* counsel took to obtain the evidence presented at the postconviction reference hearing involved "standard investigative techniques," which did not call for "any extraordinary efforts beyond simple persistence." The referee explained: "Trial counsel could have contacted petitioner's family to develop his background and childhood, including contacting his mother and other relatives either living in the same location or accessible through known family members. Evidence relating to the impact of the juvenile and adult correctional systems could have been developed by obtaining prison records and contacting inmates referenced in those records as well as conducting standard legal research of public records relating to lawsuits involving these institutions. Mental health experts could have been appointed to review the background material and to test petitioner in order to ascertain the viability of psychiatric mitigation."

In rejecting petitioner's contention that his trial attorneys were incompetent for not presenting mitigating evidence at the penalty phase of his capital trial, the majority points out that petitioner told counsel not to get his family involved in the trial. But petitioner did not ask his attorneys to do *nothing* at

the penalty phase. Petitioner's attorneys did virtually no penalty phase preparation. They presented *no* expert witnesses. Nor did they ask their investigators to do *any* work on the penalty phase. The only potential witness they contacted was petitioner's mother, even though petitioner had expressly told his counsel that he did not want his mother to testify. Although petitioner's two California defense attorneys took two trips to Mobile, Alabama (one of which had a stopover in New Orleans during the Mardi Gras holiday), on each trip they were in Mobile for less than a day, and they appear to have spent their time just looking through court records.

In not faulting defense counsel for their lack of efforts to investigate petitioner's background to uncover mitigating evidence, the majority asserts that it was up to petitioner to tell his trial attorneys about his reform school and prison experiences. But petitioner did not withhold that information. His attorneys never raised the subject. The determination of what evidence to present on petitioner's behalf at the penalty phase of his capital trial was counsel's to make. Reasonably competent counsel would have asked a mental health professional or an investigator to prepare a social history of petitioner's life, based on information from petitioner and other available sources. There is no evidence that petitioner, described by one of his trial attorneys as "very cooperative," would have refused to discuss his reform school and prison experiences in Alabama had he been asked about them.

The majority claims that "whatever mitigating evidence may have been disclosed by pursuing the conditions of incarceration petitioner experienced, counsel knew such evidence would come primarily from the testimony of petitioner's fellow prisoners, many of whom were hardened criminals with serious felony records." (Maj. opn., *ante*, at p. 1255.) The majority mischaracterizes the record. As discussed earlier, in addition to petitioner's fellow prisoners, those testifying at the reference hearing included a federal district judge, a priest, a college dean, a clinical psychologist, a longtime prison doctor, and the regional director for the Florida Bureau of Detention, all of whom gave powerfully effective testimony about the shocking conditions at Alabama's Mount Meigs reform school and in that state's prison system which corroborated the evidence of the inmate witnesses.

In defending trial counsel's inaction, the majority asserts that counsel must have been concerned that testimony about Alabama's prison conditions "could well open the door to petitioner's own extensive criminal background." (Maj. opn., *ante*, at p. 1255.) In making that assumption, the majority resorts to mixing petitioner's experiences as a young teenager at Alabama's Mount Meigs reform school with his later incarceration in Alabama prisons. As to the reform school confinement, the majority's claim that

the evidence would have opened the door to rebuttal by the prosecution is unfounded. Only the joyriding incident that led to his commitment to Mount Meigs would have been admissible in the prosecution's rebuttal if petitioner had presented testimony about life at Mount Meigs. It is unlikely that this insignificant offense, committed when petitioner was only 14 years old, would have affected the jury's penalty determination.

With respect to petitioner's Alabama prison experience, the majority fails to identify any *significant* evidence that the prosecution could have presented in rebuttal. True, the prosecution could have presented details of petitioner's Alabama convictions for murder, robbery, and escape. But the jury already knew of the convictions, and any details of those crimes would not have substantially strengthened the prosecution's case in aggravation. Indeed, at the reference hearing the prosecutor, now a superior court judge, testified that if the defense had presented evidence of the Alabama prison conditions he probably would *not* have called rebuttal witnesses to give details about petitioner's Alabama crimes.

In asserting that petitioner's attorneys had a tactically reasonable strategy that was so good as to obviate any need to investigate his past, the majority points out that counsel tried to "minimize petitioner's culpability by . . . portraying him as a follower rather than violently antisocial." (Maj. opn.; *ante*, at p. 1256.) But that was a disastrous strategy, one no reasonably competent attorney would have used. This is why: Petitioner was convicted of murdering three people, one of whom was raped. The sole eyewitness to the killings was accomplice Charles Sanders. He testified that petitioner was the leader and Sanders the follower, and that petitioner personally committed all of these crimes. The defense did not rebut that testimony. Thus, the only evidence before the jury was that petitioner was the instigator rather than a follower.

This case is not at all like *Burger v. Kemp* (1987) 483 U.S. 776 [107 S.Ct. 3114, 97 L.Ed.2d 638], which the majority cites in support of its assertion that the defense "strategy" just described was reasonable. In *Burger*, the defense attorney could credibly argue that the defendant in that case was a follower because his accomplice had committed the sexual assault that provided the motive for the murder the two of them later committed, and there was evidence that the accomplice had instigated the killing. (*Id.* at pp. 778-779 [107 S.Ct. at pp. 3117-3118].) Here there was no such evidence.

Insisting that the defense "strategy" at the penalty phase of petitioner's capital trial obviated the need to investigate petitioner's background to determine the existence of mitigating evidence, the majority points to counsel's argument that the jury should spare petitioner's life because Sanders,

his accomplice, had received a lighter sentence. (Maj. opn., *ante*, at p. 1256.) That argument was futile: As just explained, the evidence showed that petitioner was the leader and the perpetrator of the crimes while Sanders was the follower; thus, jurors were not likely to be troubled by Sanders's lighter sentence. Moreover, the defense argument was improper: This court has repeatedly held that evidence about the punishment given to codefendants or accomplices in a capital crime is irrelevant and inadmissible at the penalty phase, because it has no bearing on such issues as the defendant's conduct, character, or record, on which the jury must base its penalty determination. (*People v. Morris* (1991) 53 Cal.3d 152, 225 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Beardslee* (1991) 53 Cal.3d 68, 112 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Carrera* (1989) 49 Cal.3d 291, 343 [261 Cal.Rptr. 348, 777 P.2d 121]; *People v. Malone* (1988) 47 Cal.3d 1, 53-54 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Dyer* (1988) 45 Cal.3d 26, 69-71 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Belmontes* (1988) 45 Cal.3d 744, 810-813 [248 Cal.Rptr. 126, 755 P.2d 310].)

According to the majority, its conclusion that petitioner's trial counsel competently investigated this case is "consistent with" this court's "assessment of comparable facts in other decisions." (Maj. opn., *ante*, at p. 1260.) It relies on four cases: *People v. Gonzalez* (1990) 51 Cal.3d 1179 [275 Cal.Rptr. 729, 800 P.2d 1159], *In re Jackson* (1992) 3 Cal.4th 578 [11 Cal.Rptr.2d 531, 835 P.2d 371], *In re Ross* (1995) 10 Cal.4th 184 [40 Cal.Rptr.2d 544, 892 P.2d 1287], and *People v. Mayfield* (1993) 5 Cal.4th 142 [19 Cal.Rptr.2d 836, 852 P.2d 331]. None is on point, as discussed below.

In *Gonzalez*, defense counsel conducted a penalty phase investigation but decided not to present mitigating character evidence for fear it would lead to damaging rebuttal. That decision was tactically reasonable because (1) counsel had a viable alternative strategy, namely, a lingering doubt argument (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1250); (2) "family members had not given [defense counsel] any exceptionally sympathetic information about defendant's background" (*id.* at p. 1251); and (3) the potential· rebuttal pertained to the defendant's involvement in a drive-by shooting and a gang rape, which could have been highly damaging (*id.* at pp. 1248-1253). Here, by contrast, (1) petitioner's attorneys conducted virtually no penalty phase investigation and they had no viable alternative strategy; (2) investigation would have uncovered strong mitigating evidence about petitioner's background; and (3) as previously explained (see *ante*, at p. 1275), the prosecution could not have presented highly damaging rebuttal evidence.

In *Jackson*, this court held, unlike the majority here, that the defendant's trial counsel acted *incompetently* by "failing to conduct a reasonable investigation of defendant's background and childhood to enable him to make an

informed decision as to the best manner of proceeding at the penalty phase . . . ." (*In re Jackson, supra,* 3 Cal.4th at p. 612.)[1] Thus, *Jackson* is *inconsistent* with the majority's conclusion here that petitioner's trial attorneys acted competently when they barely made an effort to investigate petitioner's background.

In *Ross,* as here, the defendant's lead counsel was Gerald Lenoir. There, as here, Lenoir presented no mitigating evidence at the penalty phase of Ross's capital trial. A majority of this court, declining to address whether Lenoir had competently represented Ross, concluded that any inadequacy was harmless. (*In re Ross, supra,* 10 Cal.4th at p. 204.) That conclusion was wrong, as I explained in my dissenting opinion in *Ross.* (*Id.* at pp. 216-233.) Because the majority in *Ross* never decided whether defense counsel had acted competently in *that* case, *Ross* does not support the majority's holding that counsel acted competently in *this* case. Similarly, in *Mayfield,* which the majority cites but does not discuss, this court did not decide whether the defendant's trial counsel was competent, because it concluded that any inadequacy was harmless. (*People v. Mayfield, supra,* 5 Cal.4th at pp. 207, 208, fn. 15.)

In short, the cases cited by the majority do not support its conclusion that the minimal investigation conducted by petitioner's trial attorneys satisfied their "obligation to conduct a thorough investigation of the defendant's background." (*Williams v. Taylor* (2000) 529 U.S. 362, 396 [120 S.Ct. 1495, 1515, 146 L.Ed.2d 389].) This court held in *In re Marquez* (1992) 1 Cal.4th 584, 606 [3 Cal.Rptr.2d 727, 822 P.2d 435]: "In some cases, counsel may reasonably decide not to put on mitigating evidence, but to make that decision counsel must understand what mitigating evidence is available . . . ." Failure to conduct a complete investigation "cannot be supported as a tactical choice." (*Ibid.*) This court and others have consistently found that penalty phase investigations comparable to the minimal efforts expended here do not meet the standard required of a reasonably competent defense attorney in a capital case. (See, e.g., *Williams v. Taylor, supra,* 529 U.S. at pp. 395-396 [120 S.Ct. at pp. 1514-1515]; *In re Jackson, supra,* 3 Cal.4th at p. 612; *In re Marquez, supra,* 1 Cal.4th at pp. 605-606; *Karis v. Calderon* (9th Cir. 2002) 283 F.3d 1117, 1133-1139; *Caro v. Woodford* (9th Cir. 2002) 280 F.3d 1247, 1255-1256; *Silva v. Woodford* (9th Cir. 2002) 279 F.3d 825, 838-847; *Mayfield v. Woodford* (9th Cir. 2001) 270 F.3d 915, 927-928; *Ainsworth v. Woodford* (9th Cir. 2001) 268 F.3d 868, 873-877; *Jackson v. Calderon* (9th Cir. 2000) 211 F.3d 1148, 1162-1163.)

---

[1] The majority in *Jackson* went on to hold that trial counsel's failure to investigate the defendant's background was harmless. This holding was wrong for the reasons explained in the dissenting opinion, which I joined. (*In re Jackson, supra,* 3 Cal.4th 578, 616-678 (dis. opn. of Mosk, J.).)

## III

Having concluded that petitioner's trial attorneys rendered ineffective assistance at the penalty phase of his capital trial, I now turn to the issue of whether counsel's incompetence prejudiced petitioner.

The only evidence before the jury at petitioner's penalty trial was that he had killed three people in this case, and that he had four prior felony convictions, including a robbery murder when he was 16 years old. The jury knew nothing about the inhumane conditions at Alabama's Mount Meigs Industrial School for Negro Children, a reform school to which petitioner was committed after stealing a car in the early 1960's at the age of 14, and from which he was released at age 16. A juvenile probation officer familiar with Mount Meigs called it a "slave camp for children" that was run by "illiterate overseers." And a federal judge testified at the reference hearing that the facility was a "penal colony for children." (See pp. 1267-1268, *ante,* for detailed description of conditions at Mount Meigs.) The institution offered no vocational programs and virtually no education. The children had to work in the fields, picking cotton or tending vegetables. Sexual abuse was common. There were constant beatings with broomsticks and fan belts. Periodically, the children had to wade in open sewers outside the facility to remove sprouting grass.

Nor did the jury learn of what the referee here described as "abysmal" conditions in the Alabama penal system, where from the age of 16 petitioner spent almost 10 years for the murder of a grocery clerk killed by petitioner's companion in the course of a robbery, and for the robbery of a cab driver whose taxi petitioner and his companion used as a getaway car.

The referee described all of this evidence as "compelling," and the expert witnesses at the reference hearing testified that in their view petitioner's experiences helped to explain, although they did not justify, the three murders he committed in this case.

Had petitioner's counsel at trial discovered the evidence in mitigation that petitioner's habeas corpus counsel later presented at the reference hearing, and had trial counsel presented such evidence to the jury at the penalty phase of petitioner's capital trial, the jury might still have returned a verdict of death, because the three murders petitioner committed were strong evidence in aggravation. But to obtain relief on the ground that trial counsel was ineffective, petitioner need not show that it is *more likely than not* that a different result would have occurred had trial counsel provided effective representation. (*Strickland v. Washington* (1984) 466 U.S. 668, 693 [104

S.Ct. 2052, 2067-2068, 80 L.Ed.2d 674].) He need show only a "reasonable probability," that is, a probability "sufficient to undermine confidence in the outcome," that the result would not have been the same without counsel's ineffective representation. (*Id.* at p. 694 [104 S.Ct. at p. 2068].)

In *Williams v. Taylor, supra*, 529 U.S. 362, the United States Supreme Court granted a defendant's habeas corpus petition and vacated his sentence of death, holding that his trial counsel's incompetent failure to discover and present evidence of his childhood, which was "filled with abuse and privation" (*id.* at p. 398 [120 S.Ct. at p. 1515]), was prejudicial because that evidence "might well have influenced the jury's appraisal of his moral culpability" (*ibid.*). Here, because of the incompetent investigation of petitioner's trial counsel, his penalty jury did not hear mitigating evidence comparable to that not presented in *Williams*. Thus, I "cannot put confidence in the verdict of a jury that decided the case without hearing the substantial mitigating evidence that competent counsel could and should have presented." (*In re Marquez, supra*, 1 Cal.4th 584, 609.)

I would therefore grant the petition for habeas corpus and vacate the judgment of death.

Moreno, J., concurred.

Petitioner's petition for a rehearing was denied November 13, 2002. George, C. J., did not participate therein. Kennard, J, was of the opinion that the petition should be granted.