Filed 12/21/22  P. v. Sipe CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>HOWARD SYLVESTER SIPE,<br><br>          Defendant and Appellant. | A163611<br><br>(Alameda County<br>Super. Ct. No. 164341) |

Defendant Howard Sylvester Sipe appeals a judgment adjudicating him to be a sexually violent predator (SVP), pursuant to the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.).[1] Sipe contends reversal is required because there is insufficient evidence to support a current mental disorder that would make it likely he would commit a violent predatory sexual offense if released. He also asserts reversal is necessary because the trial court failed to actively ensure that he knowingly and voluntarily agreed to the nearly 10-year delay in bringing his case to trial. We find no prejudicial error and affirm the judgment.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

# BACKGROUND[2]

On August 11, 2010, the People filed a petition seeking to commit Sipe as an SVP. On February 3, 2012, the court found probable cause to believe that Sipe was an SVP and ordered him held for trial. The matter was continued for reasons discussed below until September 2, 2021.

After Sipe waived a jury trial, the matter proceeded as a court trial at which the following evidence was presented:

## A.      *State Evidence*

### 1.      *Offenses*

On the evening of May 1, 1980, Sipe, along with Dale Kubik and Virgil Van Tree, burglarized the residence of 18-year-old K.L. looking for drugs. One of the men forced K.L. to orally copulate his penis, while Van Tree raped, sodomized, and placed a sharp object in her vagina and anus. Van Tree also strangled her. At some point during the assault, K.L. felt her ankles being tied. Someone also placed a shirt over her face so she was unable to see for a period of time. Sipe later told a friend that it was his idea to use a lamp cord to tie up K.L.'s legs. Sipe said he and Kubik left the apartment before the

---

[2] Sipe requests that we take judicial notice of various psychiatric reports and articles regarding sex offenders. The Attorney General opposes the motion on the ground that psychiatric materials constitute neither facts and propositions that are of such common knowledge that they cannot reasonably be the subject of dispute nor are they capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy. (Evid. Code, § 452, subds. (g) & (h); *In re Andrews* (2002) 28 Cal.4th 1234, 1246, fn. 6.) The Attorney General also requests that we take judicial notice of the appellate record in *Sipe v. Superior Court of Alameda County* (July 30, 2021, A162947), in which we summarily denied Sipe's petition for writ of mandamus following the trial court's refusal to dismiss the SVP petition on timeliness grounds. (Evid. Code, §§ 452, 459.) We deny Sipe's request for judicial notice and grant the Attorney General's request.

assault. However, he told his friend that he went back to the apartment to retrieve a shirt he left behind and saw Van Tree raping K.L.

On the evening of August 23, 1989, K.G. was walking along a street in Oakland, working as a prostitute, when Sipe drove up in a van and asked if she wanted a ride. K.G. said yes and got into the van. Sipe drove to the Oakland waterfront. He parked, and K.G. agreed to orally copulate him for $15. She moved to the back of the van and took off her clothes. As she began to orally copulate Sipe, he "got real funny" and grabbed one of her breasts. He squeezed her nipple "really hard" and said, "I'm going to show you what pain is really like now." Sipe also punched her in the chest. K.G. was terrified, thinking Sipe might kill or seriously hurt her. She screamed for help and struggled to get out of the van, but Sipe grabbed her by the hair. K.G. managed to get out of the van, but only after Sipe had torn out a clump of her hair. Patrolling police officers observed Sipe chasing K.G., and they arrested him.

On the evening of July 12, 1993, Oakland Police Officer Norma Parker and another officer were dispatched to investigate a report of a beating at a grocery store parking lot. Witnesses had reported hearing cries for help and a man saying, "Do you want me to beat you some more?" When Officer Parker and her partner arrived on scene, people were pointing at a van in the parking lot. The officers approached the van and heard a woman cry out, "Help me." Officer Parker looked through the driver's side window of the van and saw Sipe who was naked. A naked woman inside the van, C.S., was crying hysterically. Officer Parker saw bruises on C.S.'s breasts. C.S. said Sipe had squeezed her breasts. C.S. pointed to a green bottle and said that Sipe had used it to penetrate her vagina. Officer Parker also observed a piece of plywood on the floor of the van that appeared to be wet with urine. C.S.

said that Sipe had urinated on her. Sipe did not show any obvious signs of intoxication.

On the evening of June 6, 2010, Oakland Police Officer Malcolm Miller was dispatched to investigate an illegally parked truck near the Oakland Coliseum. Officer Miller found the truck and walked up to its cab. He observed Sipe in the driver's seat and learned that Sipe was on parole. Officer Miller asked Sipe to step out of the truck, but Sipe seemed reluctant to do so. When Sipe eventually opened his door, Miller saw that his pants and underpants were lowered to his ankles. Sipe also was holding a nylon rope. Sipe said he had been "jerking off" and that he was "horny" and that he often "jerk[ed] off" in that location. Sipe also said that the rope in his hand was a power cord for his ankle monitor. Officer Miller eventually realized that the rope was knotted and inserted into Sipe's anus. Miller arrested Sipe for indecent exposure.

### 2. *Expert Testimony*

The prosecution presented expert testimony from two psychologists who routinely performed SVP examinations for the Department of State Hospitals, Drs. Kathleen Longwell and Harry Goldberg. Longwell and Goldberg each had conducted more than 1,000 SVP evaluations and each had testified as an SVP expert around 300 times. Their compensation was not dependent on the results of their evaluations.

Each psychologist had evaluated Sipe in 2010, 2020, and 2021. For the most part, the testimony of Longwell and Goldberg was similar. Each concluded Sipe met the criteria as an SVP and that he should continue his hospitalization.

In preparation for their initial evaluations of Sipe in 2010, both Longwell and Goldberg had interviewed him for about two hours. Both

psychologists gave Sipe several tests to evaluate his mental condition in 2010, including the Hare Psychopathy Checklist (PCL-R), the Static 99R, the Static-2002R, the Structured Risk Assessment (Forensic Version), and the Violence Risk Appraisal Guide.[3] Sipe's score of 31 on the PCL-R test, as administered by Longwell, placed him in the "high" range and suggested the existence of psychopathy. Sipe's score of five on the Static-99R test—the most validated and commonly used test for SVP's—placed him in the "above average" range, meaning that he was more likely to commit a violent sexual offense than 88.7 percent of the sample population. Similarly, Sipe's score of five on the Static 2002R test placed him in the "above average" risk category of the 78th percentile, meaning that he was more likely to reoffend than 22 percent of the sample population, with a 19 percent possibility of reoffending within five years. Sipe's score of 24 on the Violence Risk Appraisal Guide placed him in the eighth highest risk category (out of nine categories) for committing a violent crime upon release. Sipe's score of 3.97 on the Structured Risk Assessment (Forensic Version) similarly placed him in the "high risk/high need" category. Both psychologists noted that Sipe's relatively advanced age of 63 had been taken into account in each of the tests.[4]

Sipe refused to meet with either Longwell or Goldberg in 2020 and 2021, so they based their evaluations for those years on their prior

---

[3] Goldberg was not questioned about the Violence Risk Appraisal Guide.

[4] Sipe's score on the PCL-R test given by Goldberg was 28, slightly lower than the score of 31 on the PCL-R test given by Longwell. Also, Sipe's scores on the Static 99R and Static 2002R tests were fours while his scores on those tests given by Longwell were fives. But Sipe had told Goldberg that he had lived with a woman for more than two years, and that factor improved Sipe's scores on the latter tests from fives to fours.

evaluations, which were updated by additional information they had received from the state hospital. Both psychologists diagnosed Sipe with three disorders that predisposed him to the commission of violent and predatory sex crimes: sexual sadism, antisocial personality disorder (ASPD), and alcohol use disorder.

The psychologists opined that the crimes for which Sipe had been convicted—the violent burglary of K.L.'s apartment and the sexual attacks upon K.G. and C.S. in his van—were sadistic. The attack on K.L. had involved not merely forcible rape and oral copulation by Sipe's cohorts, but also the insertion of a sharp object into her vagina. Although Sipe was not the rapist or proven to have been the man who had forced K.L. to orally copulate him, Sipe was clearly an active participant in the crimes because he had obtained a lamp cord and tied K.L.'s ankles.

Sipe also had violently attacked two other women in his van; he had squeezed both women's breasts with the intent to inflict "real pain" on them. Sipe also humiliated C.S. by urinating on her and forcing a beer bottle into her vagina. Then in 2010, while on parole, Sipe was found half naked in a truck near the Oakland Coliseum, which displayed an obvious lack of control over his sexuality.

The psychologists further noted that Sipe routinely had denied and minimized his deviant criminal behaviors. Sipe claimed he had not participated in or witnessed any sexual assault on K.L. during the 1980 burglary of her apartment. He also claimed that K.G. had voluntarily agreed to provide sex to him in his van, but he insisted that she had suddenly become hysterical and demanded more money or drugs for her sexual services. Sipe similarly denied hurting C.S. in the 1993 incident and masturbating in his truck in 2010.

The psychologists also believed Sipe had not properly addressed his sexual sadism. They agreed that Sipe might benefit substantially from Coalinga State Hospital's sex offender treatment program (SOTP), which has been shown to reduce the risk of reoffense by as much as 22 to 25 percent. Sipe had briefly participated in the hospital's five-module SOTP program, but he completed only the very short introductory module, and he participated in the second module only for two months and in a "superficial" manner. Sipe quit the program and said, "This is not my cup of tea." Longwell also noted that SOTP participants may not advance from the second module to the third module without submitting to both a polygraph examination and a penile plethysmograph (PPG), which measures the subject's arousal to various sexual images to determine the person's "sexual interest." Goldberg believed many offenders do not want to take those tests because they would reveal a deviant arousal.

The psychologists explained that the basic characteristics of ASPD include committing crimes and other offenses with little sense of guilt, remorse, or empathy for the victims. Longwell was concerned that Sipe lacked "a sense of right and wrong that would inhibit him from acting on deviant sexual urges." Longwell also noted that when Sipe is "caught in a contradiction" when discussing his prior offenses, "he just sort of reworks the story" and denies or minimizes his responsibility. Goldberg opined that Sipe's psychopathy and sexual deviancy made for a "bad combination," which increased his risk of reoffending.

As to the alcohol use disorder, the psychologists noted that Sipe admitted having a drinking problem that had resulted in serious consequences in the past, and that he had attributed his sexual crimes to his drinking. Sipe's alcohol use disorder appeared to be in remission because he

7

had little or no ability to drink in the controlled environment of the state hospital. Longwell thought Sipe would be at a "substantial risk" to resume drinking if released, given the stresses of independent living. Longwell believed Sipe, with unrestricted access to alcohol, would be more likely to act on his sadistic urges if released from confinement.

## B. Defense Evidence

### 1. Dr. Christopher Fisher

Forensic psychologist Dr. Christopher Fisher evaluated Sipe in 2020, and concluded he did not suffer from a current mental disorder. Fisher did not believe Sipe suffered from ASPD. And, in any event, he believed there was a very low correlation between ASPD and sexual recidivism. Fisher also did not believe Sipe suffered from Sexual Sadism Disorder. Fisher thought diagnoses of that disorder had the least reliability of all sexual disorders, and that experts do not agree on the behavioral indicators that might substantiate such a finding.

Based on his review of the available records and in person evaluation, Fisher did not believe Sipe would return to violent predatory crimes if released. Fisher acknowledged that Sipe has never been released into the community without supervision since the time of his arrest in 1993.[5] As a result, any newfound knowledge or insight that Sipe had gained about his crimes had never been fully tested.

On cross-examination, Fisher admitted that Sipe had denied helping his friends attack K.L. or that he had even been present when she was raped. Fisher acknowledged that he did not believe Sipe's claims, but he thought

_____

[5] Sipe was required to wear an ankle monitor while he was briefly released on parole in 2010.

Sipe was simply "minimizing" his culpability, not lying. Fisher thought that Sipe's acknowledgment that K.L. had been violently attacked was a sort of admission of wrongful conduct, albeit with some minimization of his guilt. As a result, Fisher believed Sipe's antisocial traits appeared to have diminished as he grew older. Fisher acknowledged that Sipe had tied up K.L.'s ankles with a cord and that one of his friends had inserted a sharp object into her vagina and anus. Fisher nonetheless did not believe that Sipe had participated in the attack on K.L. for the purpose of sexual gratification.

As to the incident in his van with K.G. in 1989, Fisher said that Sipe had admitted that he had picked her up, believing she was a prostitute. Sipe told Fisher that he and K.G. had agreed upon a price for sex, and that he had squeezed her breasts without intending to hurt her. Sipe also said that K.G. had become hysterical and demanded more money. Sipe denied pulling K.G.'s hair or otherwise trying to hurt or restrain her. Fisher said he believed no criminal charges had been filed against Sipe in that case, so he could not know whose version of events was accurate— Sipe's or K.G.'s. Fisher acknowledged that Sipe had not shown any remorse over the incident, but Fisher believed Sipe's overall conduct in the incident reflected drunken anger rather than sexual sadism.

As to the incident in Sipe's van with C.S., Fisher said that Sipe had admitted squeezing her breasts and vagina, but Sipe denied any intention to hurt her. Sipe also insisted that he had neither urinated on her nor forced a beer bottle into her vagina. Instead, Sipe said he had spilled beer on the floor of the van and that he had told C.S. to use the bottle to masturbate herself, and had masturbated her with it himself. Fisher said he thought that Sipe had not "been entirely honest," but Fisher again said that Sipe's actions were based on drunken anger rather than sadism. The prosecutor questioned

9

Fisher's basis for concluding that Sipe was in a state of drunken anger. Fisher responded that he inferred Sipe was drunk from testimony that Sipe and C.S. had been drinking at a bar for an hour beforehand, and continued drinking beers in the back of the van. He believed there was evidence from a friend that Sipe was more prone to anger when he was drunk, and Fisher surmised that Sipe could have been angered by his inability to obtain an erection. Fisher added that even if Sipe had urinated on C.S., the urination was just "another consequence of this ridiculous scenario playing out in the van," i.e, "just one other example" of Sipe's "disregard for other people when he was drunk." Fisher also thought that even if Sipe had pushed a beer bottle into C.S.'s vagina (or forced her to insert the bottle into herself), any satisfaction he derived from that act would have been based on its sexual nature, rather than on any pain or humiliation she might have felt.

2. *Dr. Alan Abrams*

Dr. Alan Abrams, a board-certified psychiatrist and licensed attorney, found "many holes" in the evaluations prepared by Dr. Longwell and Dr. Goldberg. Due to COVID-19, Abrams interviewed Sipe by videoconference. He also had reviewed about 4,000 pages of Sipe's medical and legal history. Abrams did not contact anyone at the state hospital about Sipe, nor did he have access to any police or probation reports about Sipe's crimes, but he had information in Sipe's prior SVP evaluations that quoted from those reports. Based on his review of the records and his interview, he concluded that Sipe did not suffer from a qualifying mental disorder for SVP status and was not predisposed to commit a predatory sex crime in the future.

Abrams recognized that Sipe had a serious alcohol abuse problem, but he considered it significant that Sipe had not suffered an alcoholic relapse while on parole briefly in 2010. Abrams also noted that Sipe had not shown

10

any propensity to drink alcohol while in custody. Abrams believed some mental disorders disappear or diminish over time. Thus, he did not consider Sipe's prior crimes of sexual violence to be especially noteworthy in assessing the presence of a current mental disorder that would predispose him to reoffend in the future.

Abrams did not believe Sipe had ever suffered from sexual sadism. He rejected the state experts' diagnosis of that disorder, finding that Longwell and Goldberg had "made the unwarranted assumption" that such a disorder is a lifelong condition. Abrams believed Sipe's criminal record reflected violent sex acts, but the violence was not an essential element of his sexual arousal. He attributed Sipe's conduct to generalized anger rather than sadism.

On cross-examination, Abrams acknowledged that he had not reviewed the police reports and other documents describing Sipe's predicate offenses. Instead, Abrams relied on the reports prepared by other experts. As to C.S., he said he could not conclude that the liquid in the van was urine because it had not been scientifically tested. More importantly, even if Sipe had urinated on the victim, Abrams said that this single fact would not affect his diagnosis.

As to the incident with K.L., Abrams acknowledged "obvious contradictions" between Sipe's claims of relative innocence and the contrary evidence. Nonetheless, Abrams "could not address those differences" at length, and they did not in any event appear "dramatic." Abrams thought there was "only a scintilla of evidence" that Sipe had been involved in the 1980 rape of K.L. He agreed that Sipe's participation in the burglary was despicable, but he saw no evidence that it was sadistic.

Abrams thought Sipe's 2010 parole violation was not relevant to the issue of Sipe's predisposition to commit a future violent sex crime. Abrams thought there was some possibility that Sipe could have been properly diagnosed with ASPD in the past, but he did not believe Sipe met the criteria for ASPD when he evaluated him.

### 3.    State Hospital Employees

Two employees at Coalinga State Hospital also testified on Sipe's behalf. They both attested to Sipe's appropriate behavior while detained there.

## C.    Trial Court Ruling

The trial court found the allegations of the petition to be true, and that Sipe met the criteria for certification as an SVP. When rendering its decision, the court commented that normally it would be difficult to conclude, beyond a reasonable doubt, that Sipe was too dangerous to be released from custody when two expert witnesses had found that Sipe was not an SVP. However, the court found the two prosecution experts had been substantially more credible than the defense experts. Specifically, the court found that Longwell and Goldberg had impressive backgrounds and "vast experience" in performing SVP evaluations, and that their conclusions were untainted by bias and "amply supported by the proven facts."

The trial court also stated that the testimony of the retained defense experts was less credible than that of the prosecution experts, in that both defense experts had seemed to minimize the proven facts of Sipe's crimes. Specifically, the court found that Fisher had seemed to accept Sipe's versions of events to conclude that Sipe had simply been "an angry rapist," rather than a sexually violent predator. Fisher never explained any underlying facts that supported Sipe's anger, and he characterized Sipe's attack on C.S. as

nothing more than a "ridiculous scenario playing out in a van." The court also found that Abrams had seemed particularly biased in Sipe's favor—"a true believer of sorts"—in that he had limited the category of sexual sadism very narrowly. The court also thought that Abrams had mischaracterized Sipe's conduct more than once, and particularly by referring to Sipe's mere "pinching" of breasts of the victims in his van when the evidence had shown substantially more serious violence.

## DISCUSSION

### A. *Substantial Evidence*

Sipe argues the judgment must be reversed because the state's evidence that he suffered from a "*current* volitional impairment that would give rise to a substantial and well-founded risk of danger involving a violent predatory sex crime lacked solid value and credibility." The record belies this claim.

#### 1. *Applicable Law and Standard of Review*

To be committed as an SVP, the People must prove beyond a reasonable doubt that "(1) [the defendant] ha[s] been convicted of at least one qualifying sexually violent offense, (2) he has a diagnosed mental disorder that makes him a danger to the health and safety of others, and (3) his diagnosed mental disorder makes it likely he will engage in sexually violent criminal behavior in the future." (*People v. Orey* (2021) 63 Cal.App.5th 529, 561 (*Orey*); Welf. & Inst. Code, § 6600, subd. (a)(1).) Sipe challenges the sufficiency of the evidence of the last two elements.

As with any challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the verdict to determine whether substantial evidence supports the SVP finding. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466.) "[T]his court may not redetermine the credibility of

13

witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830.) In particular, we do not reassess the credibility of experts or reweigh the relative strength of their conclusions. (*Ibid.*) "The testimony of one witness, if believed, may be sufficient to prove any fact. (Evid. Code, § 411)." (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.) "Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." ' " (*Orey, supra,* 63 Cal.App.5th at p. 561.)

2. *Analysis*

The prosecution experts opined that Sipe currently suffered from sexual sadism, ASPD, and alcohol use disorder, and that these disorders made Sipe likely to reoffend in a sexually violent predatory manner. They explained the bases of their opinions and were cross-examined by Sipe's counsel. While Sipe points to numerous instances where defense experts contradicted the state experts, this conflict was for the trier of fact, not the appellate court, to resolve. (*People v. Sumahit* (2005) 128 Cal.App.4th 347, 352 (*Sumahit*).) The trial court's determination that Sipe qualified as an SVP shows that it resolved the conflict in expert opinions against Sipe and found the People's experts credible. (See, e.g., CALCRIM No. 332 ["If the expert witnesses disagreed with one another, you should weigh each opinion against the others"].)

Sipe contends there is insufficient evidence he *currently* suffers from sexual sadism, ASPD, and alcohol use disorder because the prosecution experts relied on the facts of decades-old offenses to support their diagnoses. However, experts may properly consider a defendant's past crimes in

14

assessing whether he currently suffers from a mental disorder. (See *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1163–1164.)

Moreover, it is significant that Sipe refused to meet with Longwell and Goldberg in 2020 and 2021, while agreeing to meet with defense experts in 2020. In *Sumahit, supra*, 128 Cal.App.4th 347, the appellate court held that a similar refusal prohibited an SVP defendant from even raising an appellate challenge to the sufficiency of the evidence to support the SVP commitment. (*Id.* at pp. 353-354.) The court explained: "[W]e cannot overlook the significance of defendant's refusal to be interviewed by either of the state's experts. The law has a strong interest in seeing to it that litigants do not manipulate the system, especially where to hold otherwise would permit them to ' "trifle with the courts." ' [Citations.] Here, defendant fully cooperated with his own psychologist, while denying the People's doctors the opportunity to interview him . . . . A sex offender cannot deny the state access to the workings of his mind and then claim a lack of proof that he has a current psychological disorder. Because he refused to be interviewed by the state's experts, who could have formed an opinion as to his present dangerousness, defendant has forfeited the claim that the state did not prove that he was currently dangerous. [Fn. omitted.]" (*Ibid.*) Although we decline to find that Sipe forfeited his contention that the People failed to prove he is currently dangerous, Sipe's refusal to meet with Longwell and Goldberg constitutes evidence that Sipe remained a sexually violent predator at the time of trial. (*Orey, supra,* 63 Cal.App.5th at p. 563.)

Additionally, Sipe's "refusal to undergo treatment constitutes potent evidence that he is not prepared to control his untreated dangerousness by voluntary means. . . . A patient's refusal to cooperate in any phase of treatment may therefore support a finding that he 'is not prepared to control

his untreated dangerousness by voluntary means if released unconditionally to the community.'" (*Sumahit, supra,* 128 Cal.App.4th at pp. 354-355.)

Finally, that Sipe did not engage in any overt sexual sadism or alcohol abuse while at the state hospital is not remarkable, but is, in fact, "to be expected." (*Orey, supra,* 63 Cal.App.5th at p. 563.) "The fact that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others." (*Sumahit, supra,* 128 Cal.App.4th at p. 353.) Sipe engaged in predatory acts of sexual violence against vulnerable victims while intoxicated. Because he currently lacks ready access to vulnerable victims and alcohol, his lack of outward signs of sexual deviance is not dispositive of whether he is likely to reoffend if released into society at large. "Such an assessment must include consideration of his past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case." (*Sumahit, supra*, 128 Cal.App.4th at p. 353.) Other risk factors in this case include Sipe's continued lack of empathy and lack of remorse, which the state experts explained are hallmarks of ASPD.

Sipe's reliance on *People v. Johnson* (2020) 55 Cal.App.5th 96 and *People v. Redus* (2020) 54 Cal.App.5th 998 is misplaced. *Johnson* reversed a commitment extension order where the record was devoid of evidence suggesting the 69-year-old mentally disordered offender's decompensation in an unsupervised setting would lead to violence, particularly in light of the fact that he had spent 11 years in the community and had stopped taking his medication for periods of time with no violent repercussions. (*Johnson*, at pp. 108–109.) Additionally, some of the defendant's delusions "had 'gone away'" and there was no "evidence of recent violence or aggression." (*Id.* at pp. 99, 101, 110.) In *Redus*, the appellate court concluded the prosecution

failed to "provide the required link" between the defendant's "mental illness and his purported difficulty in controlling his potentially dangerous behavior." (*Redus*, at p. 1013.) *Redus* noted there had "not been a hint of violence, threatening behavior, or aggressiveness of any kind" by the 73-year-old defendant — a " 'fragile old man' " — for more than four decades, "even through [conditional] releases and medication lapses." (*Id.* at pp. 1011, 1012.) In contrast to these cases, diagnostic evidence demonstrated that Sipe was in the high-risk category for reoffending; this evidence was bolstered by the fact that Sipe refused to make a meaningful effort towards rehabilitation in the SOTP.

We conclude that Sipe's refusal to accept treatment, coupled with valid diagnoses that he suffers from sexual sadism, ASPD, and alcohol use disorder are sufficient to sustain the trial court's finding that he suffers from a diagnosable mental disorder that makes it likely he will engage in sexually violent criminal and predatory conduct if released. (See *Sumahit, supra,* 128 Cal.App.4th at p. 355.)

## B.     *Trial Court's Duty to Supervise and Manage Case Delays*

Sipe argues that the trial court failed "to actively supervise and manage this case to [e]nsure that years of continuances and delay in trial setting" was the result of "a personal, informed and voluntary decision" that he made. In response, the Attorney General engages in a thorough due process analysis regarding the timelines of Sipe's trial, arguing that the trial court reasonably found that the delay was either caused by Sipe or was sought for his benefit. Sipe does not quarrel with the details of that analysis in his reply, but contends that the blame cannot be shifted to him when the trial court failed in its duty actively to manage the case and to inquire directly as to his wishes.

17

*1.    Background*

a.    SVP Petition Filed Followed by Years of Continuances

The Alameda County District Attorney's Office filed a petition for Sipe's commitment as an SVP in August 2010. Sipe appeared in court for arraignment on the SVP petition on August 13, 2010. Counsel was appointed and the matter was continued to September 10, 2010, at which time Sipe personally waived time for his probable cause hearing.

The probable cause hearing concluded on February 3, 2012. Sipe, who was present at the hearing, was not asked about his desire for a trial. Between February 2012 and March 2017, it appears Sipe's case was called at least 23 times. However, as neither party provided an oral record from any of the continuances, the record is unclear about who sought the continuances and for what reasons, and whether there were any objections or good cause findings.

A newly assigned deputy public defender appeared in July 2017; he continued the case himself 12 times through November 2019 without any motions, hearings or a trial setting.[6] Sipe's personal appearance was consistently waived at each appearance and the clerk's record provides no reasons for the continuances. In November 2019, new defense counsel was appointed.

b.    Sipe's Motion to Dismiss and Evidentiary Hearing

On April 10, 2020, defense counsel filed a motion to dismiss the SVP petition as untimely under *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36 (*Vasquez*).

---

[6] As Sipe notes, it is difficult to accurately total the number of unexplained continuances based on the overlapping time frames set out by the trial judge.

18

The trial court heard testimony on Sipe's motion to dismiss the SVP petition on November 6 and 20, 2020, and January 22, 2021. Sipe was present for all but one session of the evidentiary hearing.

Sipe testified on his own behalf. He stated that Dr. Schwartz and Dr. Richard Romanoff previously had found in 2009 that he did not meet the SVP criteria. He believed that if he went to trial, both doctors would have made favorable witnesses for him. But he also admitted that he did not ask either of his public defenders to set the case for trial.

Sipe explained that he and Margo George, his first attorney, had discussed setting the case for trial, but he had asked her to continue the case because he hoped to "flip" the state's evaluators, i.e., change their opinions about whether he met the SVP criteria. Sipe also said that he and George agreed that she would litigate motions while he would engage in sex offender treatment at Coalinga State Hospital in the hope of flipping the state evaluators. Specifically, Sipe had said to George "many times," "[L]et's run this until how far we can go [*sic*] to see if everything will be dropped." Sipe added, "And over a couple of years, this is what we did, up until [George's] retirement." Sipe also said he did not want to risk "a lifetime commitment by going to trial and losing," and he probably would not have felt good if the judge had set the case for trial. When asked if he was personally hopeful to receive an SVP trial, Sipe responded, three times, that that decision was for his attorney to make. Overall, Sipe said he was happy with the way that George had handled his case.

In explaining his prior relationship with his second attorney, Sachiel Slavin, Sipe said that he and Slavin had talked about possibly taking the case to trial, and that Slavin had encouraged him to speak up if he ever wanted to do so. Sipe admitted he never "got back" to Slavin on that issue.

19

Sipe knew at the time that if he had gone to trial and lost, he would have been subject to an indeterminate hospital commitment. He never wanted to risk that happening.

Dr. Romanoff testified that he had determined in 2009 that Sipe did not meet the criteria for civil commitment under the SVPA. Romanoff had stopped doing SVP evaluations in about 2013, however, and he had not kept current with the "specialized field of forensic study" involved in such evaluations. As a result, he thought he would not be a helpful witness for Sipe at an SVP hearing.

The prosecutor called both of Sipe's former public defenders to testify at the hearing. Attorney George testified that she had spent over 30 years at the public defender's office before retiring in March 2017. George said that Sipe initially wanted to "move the case along as quickly as possible." After the probable cause hearing, however, Sipe did not want to go to trial and never asked her to set a trial date. George and Sipe agreed that their best strategy would be for him to pursue the SOTP at Coalinga State Hospital while she tried to get his case dismissed (or, at the very least, get new and more favorable psychological evaluations). Sipe had asked her to continue the case, and she thought that was wise. George said she would have set a trial date if Sipe had asked for one, but he never did. Because George did not believe a trial was in Sipe's best interests, she did not push the idea.

George said that she and Sipe hoped they could flip an evaluator. George confirmed on cross-examination that neither the prosecution nor the trial court ever "pushed" her to set a trial date. She could not recall the court ever making a good cause finding to continue the case, but she also had no memory of how requests for continuances were addressed by the court.

When specifically asked if Sipe had ever waived his right to a speedy trial, George said that "nobody knew" at that time that there was any such right in an SVP proceeding. She knew that Sipe had a due process right to a trial within a reasonable time period, but she thought Sipe may have waived that right at the conclusion of the probable cause hearing. She had no independent memory of such a waiver, however, and the court records did not indicate such a waiver.

Sipe's second attorney, Sachiel Slavin, testified about the public defender office's heavy caseload, but he denied that he had ever been too busy to prepare for or try a case. He said the office funding and staffing did not affect his decision to set a trial date in Sipe's case. Slavin explained that he rarely arranged to have Sipe brought to court for appearances because the conditions at the jail were "horrific," and Slavin kept in regular contact with Sipe by phone, written correspondence, and occasional personal visits at Coalinga State Hospital. Also, Slavin understood that Sipe "explicitly did not want to be brought to the jail in order to be present in court."

When evaluating an SVP case, Slavin considered many factors, including the client's diagnosis and treatment status, the qualifying offenses, a defense expert's opinion (if any), and the client's age and desire for a trial. However, a client's demand for a trial was "just about determinative," even if Slavin felt "other factors weigh[ed] against" going to trial. Slavin had talked with Sipe "about his desire or not to go to trial" and the "benefits and consequences of litigating the case in that way." At one point Slavin testified that he did not believe Sipe had made a "trial demand", and he later said, twice, that he saw no need to override Sipe's "explicit desire not to go to trial."

Rather than set the case for trial, Slavin felt it was in Sipe's best interests to litigate the case in other ways. Slavin discussed with Sipe

"different legal strategies and evidence-gathering strategies" that they were "going to embark upon," and Slavin was "endeavoring to do those things." They did not set a trial date because it was Sipe's "explicit desire" not to do so. Slavin strongly believed that Sipe would have been harmed by going to trial and risking adjudication as an SVP because there would be lifetime consequences like "more onerous" registration and residency requirements. Slavin believed he had competently represented Sipe and that he had followed the plan they had mutually agreed upon.

At the conclusion of his testimony, Slavin again said that Sipe had always been "explicit" in not wanting Slavin to set a trial date.

The parties stipulated that the other psychologist who had evaluated Sipe in 2009, Dr. Mark Allen Schwartz, died on February 7, 2017.

c. Court's Ruling and Writ Proceedings

In a detailed, 33-page memorandum of decision, the trial court denied Sipe's motion to dismiss. The court explained that Sipe had demonstrated that he was prejudiced by the delay due to the loss of favorable witnesses. Nevertheless, the court concluded that prejudice was "outweighed by Sipe's express desire to avoid trial."

Sipe petitioned this court for a writ of mandamus. We summarily denied the petition, noting the trial court's "well-reasoned" analysis.

2.      *Analysis*

Under the SVPA, the state can civilly commit an individual found to be an SVP indefinitely for confinement and appropriate treatment in a state hospital. (§ 6604.) "The SVPA does not establish a deadline by which a trial on an SVP petition must be held after the trial court finds probable cause to believe the inmate is an SVP." (*Vasquez*, *supra*, 27 Cal.App.5th at p. 57.)

Further, because it is a civil proceeding—not a criminal prosecution—the Sixth Amendment right to a speedy trial does not apply. (*Ibid.*) Nevertheless, "[b]ecause civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections." (*People v. Otto* (2001) 26 Cal.4th 200, 209.) This includes the due process right to a timely trial. (*In re Butler* (2020) 55 Cal.App.5th 614, 638.)

Preliminarily, we agree the trial court had an obligation to ensure Sipe received a timely trial. "Even where the attorneys stipulate to continue a trial date, the trial court has an obligation to determine whether there is a good cause for the continuance. The trial court also has a responsibility absent a written time waiver to inquire of a defendant whether he or she agrees to the delay." (*Vasquez, supra*, 27 Cal.App.5th at p. 75; *People v. Williams* (2013) 58 Cal.4th 197, 251 ["the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner"].) Even a "neutral reason such as negligence or overcrowded courts should be weighted less heavily [against the government] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." (*Barker v. Wingo* (1972) 407 U.S. 514, 531.)

There were more than 30 continuances in this case over 10 years. However, it is unclear who sought the continuances, if any reasons were stated on the record, and whether there were any objections or good cause findings. Sipe contends the trial court—by failing to "actively supervise and manage" his case to ensure that "years of continuances and delay in trial setting" was the result of his "personal, informed, and voluntary" decision—abandoned its role as "captain of the ship." (*Vasquez, supra,* 27 Cal.App.5th at p. 76.) To a certain degree, he is correct. However, Sipe's *express* desire to

23

avoid trial mitigated any prejudice caused by any lapses in "judicial housekeeping." (See, e.g., *Vermont v. Brillon* (2009) 556 U.S. 81, 89 [discussing defendant's role in delay].)

*Butler*, cited by Sipe, does not advance his claims. In *Butler,* the defendant made several " 'sincere and repeated demands' for a timely trial" dating back to the filing of the SVP petition. (*In re Butler, supra,* 55 Cal.App.5th at p. 649.) Among other things, the record contained letters by the defendant to the trial judge and one of his public defenders; testimony by the same public defender at the evidentiary hearing; defendant's statements at a *Marsden*[7] hearing; counsel's statements to the court during the same hearing; and defendant's declaration submitted in support of his habeas petition. (*Ibid.*)

Unlike *Butler,* there was no evidence that Sipe made sincere and repeated demands for trial or otherwise conveyed any concerns about the delays in setting a trial date. Rather, Sipe testified at the evidentiary hearing that he did not want to go to trial. Sipe reported he had instructed attorney George to "run" the case out as long as possible. Both of his public defenders corroborated Sipe's story. George testified that Sipe asked her to push the case off for as long as possible. Slavin explained they did not set a trial date because it was Sipe's "explicit desire" not to do so.

Accordingly, on this record, any error by the trial court in its management of this case was harmless under any standard.

## DISPOSITION

The judgment is affirmed.

GOLDMAN, J.

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118.

24

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.